**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2009-NMCA-052

Filing Date: April 7, 2009

Docket No. 26,842

STATE OF NEW MEXICO,

　　　　Plaintiff-Appellee,

v.

CLARK PERRY,

　　　　Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Denise Barela Shepherd, District Judge**

Gary K. King, Attorney General
Andrea Sassa, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Nancy M. Hewitt, Appellate Defender
Joseph P. Walsh, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**CASTILLO, Judge.**

**{1}** Defendant's grounds for appeal are several. Relying on the Fifth Amendment to the United States Constitution as well as Article II, Section 15 of the New Mexico Constitution, Defendant contends that investigators should have ceased to question him thereby making his answers to their questions inadmissible. Additionally, Defendant asserts that the trial court tendered improper jury instructions, that the prosecutor's misconduct should have resulted in a mistrial, and that neither the jury verdict nor his sentence were supported by

substantial evidence. Because we discern no error, we affirm on all issues.

## I. BACKGROUND

**{2}** This case arises from events that took place on the night of July 2, 2002, and the early morning of July 3, 2002. The following facts are basically undisputed. On that night, Defendant and Timothy Hawkins (Hawkins) were driving a vehicle around Albuquerque that was owned by a friend of Hawkins, though the friend was unaware that Hawkins had the vehicle. Hawkins drove to a 7-11 convenience store, robbed it at gunpoint, returned to the car, and drove away. Defendant remained in the car during the robbery. Defendant and Hawkins then drove to a Dunkin' Donuts store where they both went inside. The men did not rob the Dunkin' Donuts because the "[a]tmosphere wasn't right." Instead, they bought a box of donuts and returned to the car. They drove to a second 7-11 convenience store and again robbed it at gunpoint while Defendant remained in the car.

**{3}** After the robberies, Defendant was driving about sixty miles an hour, running stop signs, and turning the headlights on and off. Eventually, Defendant ran a stop sign and struck a truck driven by Nick Nellos (Nellos). The passenger airbag in the car deployed and as Hawkins struggled with the airbag, he heard someone outside the car ask if they were all right. Hawkins then heard a shot, and he saw that Defendant was not in the car. Hawkins got out of the car and saw Nellos on the ground near the truck. Hawkins took the gun from Defendant and fired one or two more shots at Nellos, who later died from the wounds. Defendant and Hawkins ran together from the scene.

**{4}** The pair ran toward Lovelace Hospital and met Sheila Liebschwager (Liebschwager), who was getting out of her van. Hawkins pointed the gun at Liebschwager and ordered her to get back in her vehicle. Liebschwager complied and drove toward Hawkins' girlfriend's house where Hawkins got out of the van—but not before Hawkins took money and cigarettes from Liebschwager and gave Defendant some of the money. Defendant continued to ride with Liebschwager until he got out at a stop sign. When Defendant left the van, Liebschwager called the police, and both men were arrested.

**{5}** After his arrest, Defendant was interviewed by two detectives, and he admitted that both he and Hawkins had fired shots at Nellos. Defendant was indicted on (1) one count of alternatively first degree murder, second degree murder, manslaughter, or felony murder; (2) one count of conspiracy to commit first degree murder; (3) three counts of armed robbery; (4) two counts of conspiracy to commit armed robbery; (5) two counts of conspiracy to commit aggravated assault; (6) one count of kidnapping; (7) one count of conspiracy to commit kidnapping; and (8) one count of tampering with evidence. The State did not ultimately pursue the counts for conspiracy to commit aggravated assault or the felony murder alternative.

**{6}** Defendant filed a motion to suppress his statements, which the trial court granted in part. The case went to trial, and Defendant was convicted of second degree murder and

2

conspiracy to commit second degree murder, armed robbery and conspiracy to commit armed robbery, and kidnapping and conspiracy to commit kidnapping. The jury acquitted him for one count of armed robbery and one count of conspiracy to commit armed robbery. The trial court directed a verdict on another count of armed robbery and the evidence tampering count.

**{7}** After finding Defendant to be a habitual offender, the trial court imposed an enhanced sentence totaling 95 years imprisonment with 20 years suspended. Defendant appeals.

## II. DISCUSSION

**{8}** On appeal, Defendant challenges four aspects of the investigation and the subsequent trial: (1) the admission of incriminating statements made by Defendant to investigators, (2) the denial of some proffered jury instructions, (3) the comments made by the prosecutor during closing arguments, and (4) the sufficiency of evidence. We address each argument in turn.

### A. Incriminating Statements

**{9}** Defendant argues that the trial court improperly denied his motion to suppress and admitted incriminating statements, contrary to both the United States and the New Mexico Constitutions. "When reviewing the denial of a motion to suppress on appeal, we view the evidence in the light most favorable to the district court's decision. We then determine whether the court properly applied the law when it denied the motion to suppress." *State v. Castillo-Sanchez*, 1999-NMCA-085, ¶ 6, 127 N.M. 540, 984 P.2d 787 (citation omitted).

**{10}** According to testimony at the suppression hearing, the two detectives who questioned Defendant advised him of his constitutional rights and asked if he understood them. At first, Defendant said that he did not understand. The detectives provided more explanation, after which Defendant indicated he understood. One of the detectives explained that "[w]hat we're here for is basically a crime spree that happened throughout Albuquerque early this morning[; y]ou are aware of that[,] right?" Defendant answered, "Yes." The detective then asked, "Okay, are you willing to talk to us right now[?]" Defendant answered, "I ain't really got too much to say." The detective followed up and asked, "Well, with the stuff that you do have to say do you mind talking to us about it?" Defendant responded, "Yeah, all right."

**{11}** After further explaining Defendant's rights, one of the detectives asked Defendant if he was "willing to talk about the things that you know about right now," and Defendant responded, "Yeah." Defendant then signed a waiver of rights, and the interview proceeded. One of the detectives directed the questions toward the shooting. Defendant said, "I didn't shoot the guy." The detectives asked him who had fired the shots, and Defendant responded, "Well, we both did." At some point after that admission, Defendant told the detectives, "I

3

don't got nothin' else to say." Although the detectives appear to have changed the subject after this statement, they continued to ask questions. Throughout the rest of the interview, Defendant said, "I don't want to keep talkin'," and "I'm all right, but I just don't feel like talking no more." Finally, Defendant said, "That's all I know. I don't want to talk no more. No more." Despite these statements, the detectives did not stop the interview.

{12} The trial court suppressed all of Defendant's statements after he said, "I don't got nothin' else to say." The admissions made before that statement, including his response to the question about who fired the shots, were allowed into evidence. The State does not appeal the exclusion of the latter portion of the interview, and we therefore do not address the admissibility of those statements. Defendant argues that none of the interview should have been admissible because his statement, "I ain't really got too much to say," expressed his desire to stop the questioning at that point. According to Defendant, the detectives continued the interrogation and thereby failed to scrupulously honor Defendant's invocation of his right to remain silent. We first address Defendant's rights under the Fifth Amendment to the United States Constitution and then turn to his argument regarding Article II, Section 15 of the New Mexico Constitution.

1. The Fifth Amendment to the United States Constitution

{13} In *Miranda v. Arizona*, the Supreme Court of the United States considered "the admissibility of statements obtained from an individual who is subjected to custodial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." 384 U.S. 436, 439 (1966). Under *Miranda*, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. A defendant may voluntarily and knowingly waive these rights. *Id.* If, however, the defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. Similarly, "if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Id.* at 445.

{14} Although *Miranda* dictates when questioning must cease, the Court left for another day the question of when questioning may be resumed. *Michigan v. Mosley*, 423 U.S. 96, 101 (1975). In *Mosley*, the Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Mosley*, 423 U.S. at 104 (internal quotation marks omitted). Defendant argues that his statement, "I ain't really got too much to say," invoked his rights under the Fifth Amendment because it was an indication "in any manner" that he did not wish to be interrogated. *Miranda*, 384 U.S. at 445. Further, Defendant contends that all of his later statements—including his answer to the detective's question regarding the identity of the shooter—were inadmissible because the detectives

4

failed to scrupulously honor his right to cut off questioning.

**{15}** Thus, Defendant urges us to evaluate whether Defendant invoked his right to remain silent under *Miranda* and, if so, whether later statements were inadmissible under *Mosley*. The State argues that Defendant did not invoke his right to silence, according to a standard articulated in *Davis v. United States*, 512 U.S. 452 (1994). Because we conclude that Defendant did not invoke the right to remain silent, we do not reach the *Mosley* issue. We begin by considering the applicability of *Davis*.

**{16}** In *Davis*, the United States Supreme Court evaluated whether an investigator is required to suspend questioning when "a suspect makes a reference to counsel that is insufficiently clear." 512 U.S. at 454. The *Davis* Court fashioned an objective test in order to determine whether a suspect has actually invoked the right to counsel: "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459. Stated another way, "the suspect must unambiguously request counsel." *Id.* The State recognizes that *Davis* does not address the invocation of the right to silence but nevertheless argues that the *Davis* standard should apply to our current analysis.

**{17}** The federal circuit courts of appeal have taken two approaches as to whether the *Davis* test applies to the invocation of the right to silence. Some courts have determined outright that the *Davis* standard applies: "This court has interpreted *Davis* to apply equally to the invocation of the right to counsel and the right to remain silent." *Franklin v. Bradshaw*, 545 F.3d 409, 414 (6th Cir. 2008); *see also United States v. Nelson*, 450 F.3d 1201, 1211-12 (10th Cir. 2006); *United States v. Acosta*, 363 F.3d 1141, 1152 (11th Cir. 2004); *Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001); *United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir. 1996), *judgment vacated on other grounds by Mills v. United States*, 519 U.S. 990 (1996). Other courts have reviewed the circumstances of the interrogation in order to determine whether the defendant's words or actions constituted an invocation of the right to remain silent or the functional equivalent of silence—without adopting *Davis*. *See United States v. Teleguz*, 492 F.3d 80, 88 (1st Cir. 2007) (citing but not adopting *Davis*); *Soffar v. Cockrell*, 300 F.3d 588, 594-95 & n.5 (5th Cir. 2002) (declining to address whether *Davis* applies in this context); *Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (analogizing to but not adopting *Davis*); *United States v. Ramirez*, 79 F.3d 298, 303-05 (2d Cir. 1996) (citing but not adopting *Davis*). No circuit has held that *Davis* is entirely inapplicable to the invocation of the right to remain silent. *But see* Wayne D. Holly, *Ambiguous Invocations of the Right to Remain Silent: A Post-*Davis *Analysis and Proposal*, 29 Seton Hall L. Rev. 558, 560-62, 575 (1998) (faulting the lower federal courts for applying *Davis* "with little or no independent analysis" and proposing that *Davis* should not apply to the right to remain silent).

**{18}** Defendant does not raise *Davis* or argue that it should not apply to the facts of this case. Instead, Defendant analogizes the facts before us to those in *Cuervo v. State*, 967 So.

2d 155 (Fla. 2007). This mirrors the approach taken by the First, Second, Fourth, and Fifth Circuits—evaluating whether the facts of a particular interrogation support a conclusion that the defendant indicated "in any manner" that he wished to cease questioning. *Miranda*, 384 U.S. at 445. Thus, before deciding whether to apply *Davis* in this context, we will first consider whether Defendant's response could indicate "in any manner" an invocation of the right to remain silent. *Id.*

**{19}** In *Cuervo*, a Spanish-speaking defendant moved to have an incriminating statement suppressed, arguing that he had invoked his right to silence when he told the police through a translator, "I don't want to declare anything." 967 So. 2d at 157. The Florida Supreme Court concluded that this statement "constituted a clear invocation of the right to remain silent," particularly because it "came solely in response to the inquiry concerning his *Miranda* rights." *Cuervo*, 967 So. 2d at 163. There is no similarity between the words used by Defendant here and the words translated for the defendant in *Cuervo*. In the present case, as we explained, the detective asked Defendant, "Are you willing to talk to us right now[?]," and Defendant said, "I ain't really got too much to say." Even though both defendants were responding to an inquiry concerning their willingness to talk to police, in *Cuervo*, the defendant communicated that he did not want to speak. We agree with the State that Defendant's response communicated that he did not have a lot of information to provide—not that he wished to remain silent. *See Jones v. Kemp*, 706 F. Supp. 1534, 1551 (N.D. Ga. 1989) (concluding that a defendant did not invoke the right to remain silent because he did not refuse to answer questions and did not ask for the questioning to stop).

**{20}** Defendant's statement is closer to that made by the defendant in *State v. Perkins*, 540 So. 2d 556 (La. Ct. App. 1989). In *Perkins*, the defendant was advised of his rights, and he indicated that he understood them. *Id.* at 558. Before the detective turned on the tape recorder, however, the defendant stated, "I don't know if I want to say too much into that thing or not." *Id.* The detective reiterated that the defendant was not required to speak; nevertheless, the defendant agreed to give a statement. *Id.* After reviewing the conversation, the *Perkins* court concluded that "[a]t best, it appears that the defendant may have been questioning whether to give a *recorded* statement, as opposed to his previous unrecorded statement, but the remarks clearly do not constitute an invocation of his right to remain silent." *Id.* at 559. Similarly, in the present case it appears that, at best, Defendant was qualifying the quantity or quality of the information he had to offer and was not indicating that he did not wish to speak to the detectives at all. *See also Jones*, 706 F. Supp at 1551 (finding that the defendant's "statement to [an officer] that he did not want to tell 'what is going on' because he 'might get in too much trouble'" was not an invocation of the right to remain silent); *People v. Montaño*, 277 Cal. Rptr. 327, 334 (Dist. Ct. App. 1991) (concluding that the defendant's response, "I can't" to an officer's question, "Can you tell us what happened?" was not an invocation of the right to remain silent); *State v. Gaspard*, 685 So. 2d 151, 155 (La. Ct. App. 1996) (holding that the statement, "I don't know nothing about no murder," was not an invocation of the right to remain silent).

**{21}** According to Defendant, the circumstances of his mental state are relevant to our

analysis of his invocation of the right to remain silent. Defendant argues that he "was having difficulty understanding the events that were transpiring around him" and that as a result, "the detectives should have realized that [Defendant's] statement that he 'ain't really got too much to say' was his expression of his desire to have the detectives cease questioning." Defendant relies on two points: that he did not appear to understand his constitutional rights and that he was later diagnosed with mild mental retardation. We disagree that these circumstances are determinative for two reasons. First, although Defendant expressed some initial confusion about his constitutional rights, the detectives continued to explain them until Defendant indicated that he understood. Second, Defendant's later diagnosis does not alter what he communicated to the detectives. He was asked if he was willing to talk, and he responded that he did not have much to say. After one of the detectives asked if he would share what he did know, Defendant responded in the affirmative. Later in the interview, when Defendant did not wish to speak or communicate further, he made his desires clear by saying, "I don't got nothin' else to say." Nothing evident in the circumstances of the conversation should have alerted the detectives that Defendant was having special difficulty understanding the developing situation.

**{22}** As the Second Circuit explained, "[i]n some circumstances . . . a suspect's statement as to his willingness or unwillingness to answer questions, or his silence in response to some questions, does not constitute even an ambiguous or equivocal invocation of the right to remain silent." *Ramirez*, 79 F.3d at 304. Defendant's words did not create ambiguity about his desire to continue talking to detectives. Defendant's words communicated that he was not well informed. Because Defendant's statement did not even ambiguously invoke his right to remain silent under *Miranda*, we do not further consider whether the standard articulated in *Davis*—that a suspect must unambiguously invoke the right—should apply to the facts of the present case. Accordingly, we hold that Defendant did not invoke his right to remain silent under the Fifth Amendment to the United States Constitution and that the trial court properly admitted those statements made by Defendant after he stated, "I ain't really got too much to say."

## 2.      Article II, Section 15 of the New Mexico Constitution

**{23}** Defendant also argues that the New Mexico Constitution affords him greater protection than the federal constitution. Specifically, Defendant argues that under the New Mexico Constitution, if investigators are unsure about whether a suspect has invoked his right to remain silent, the investigators are required to ask the suspect, "Are you invoking your right to remain silent?" The federal courts have imposed no such clarification requirement on investigators. *See Davis*, 512 U.S. at 461-62 (refusing to adopt a rule requiring investigators to clarify whether a suspect has requested counsel). The State contends that Defendant has provided no authority to support broader state constitutional protection and that, in any event, the interrogating detectives in the present case adequately clarified Defendant's statement in the very manner that he now argues should be constitutionally required. We begin by considering the circumstances under which our courts have afforded greater protections based on the New Mexico Constitution.

7

**{24}** In *State v. Gomez*, our Supreme Court adopted the interstitial approach to interpreting our state constitution. 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1. "A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Id.* Defendant argues that New Mexico has interpreted the exclusionary rule—the rule requiring the suppression of evidence if it was obtained in violation of a defendant's constitutional rights—in a manner that is distinctive from and more protective than the federal application of the rule. As a result, Defendant argues that the New Mexico Constitution has historically provided defendants with more protection from unconstitutionally obtained evidence than the federal constitution, thus providing support for Defendant's proposed exclusion of the incriminating statements that he made to the detectives during the interview.

**{25}** In order to establish the dichotomy between state and federal law, Defendant cites *United States v. Patane*, 542 U.S. 630 (2004), and *State v. Gutierrez*, 116 N.M. 431, 863 P.2d 1052 (1993). In *Patane*, the United States Supreme Court considered whether "a failure to give a suspect the warnings prescribed by *Miranda* . . . requires suppression of the physical fruits of the suspect's unwarned but voluntary statements." 542 U.S. at 633-34 (citation omitted). The *Patane* Court concluded that the exclusionary rule did not apply, in part, because "[u]nlike the Fourth Amendment's bar on unreasonable searches, the Self-Incrimination Clause is self-executing." *Id.* at 640, 642. "[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *Id.* at 640 (internal quotation marks and citation omitted).

**{26}** In *Gutierrez*, our Supreme Court evaluated whether "evidence obtained by virtue of an invalid search warrant nevertheless may be admitted under the exclusionary rule's 'good-faith' exception." 116 N.M. at 432, 863 P.2d at 1053. Because the federal constitution recognizes an exception to the exclusionary rule based on the good-faith reliance on a subsequently invalidated warrant, *see United States v. Leon*, 468 U.S. 897, 922 (1984), *superceded by rule on other grounds as stated in In re Search of Kitty's East*, 905 F.2d 1367, 1372 (10th Cir. 1990), *Gutierrez* conducted an independent analysis of the question under Article II, Section 10 of the New Mexico Constitution. 116 N.M. at 435, 863 P.2d at 1056. The *Gutierrez* Court rejected the federal good-faith exception. *Id.* at 445, 863 P.2d at 1066. Thus, the New Mexico Constitution requires unconstitutionally obtained evidence to be excluded because "[d]enying the government the fruits of unconstitutional conduct at trial best effectuates the constitutional proscription of unreasonable searches and seizures by preserving the rights of the accused to the same extent as if the government's officers had stayed within the law." *Id.* at 446, 863 P.2d at 1067. *Gutierrez* has since been characterized as vesting an individual state constitutional right to the application of the exclusionary rule in search and seizure cases. *State v. Wagoner*, 2001-NMCA-014, ¶ 29, 130 N.M. 274, 24 P.3d 306. We are not persuaded that *Patane* and *Gutierrez* demonstrate a fissure between the state and federal approaches to the issues presented by the present case.

**{27}** The two cases address disparate aspects of constitutional law. *See Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (emphasizing that the "fundamental differences between the role of the Fourth Amendment exclusionary rule and the function of *Miranda* in guarding against the prosecutorial use of compelled statements as prohibited by the Fifth Amendment"). *Patane* addresses the application of the exclusionary rule to the Fifth Amendment—that "'[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" 542 U.S. at 637 (quoting U.S. Const. amend. 5). *Gutierrez* dealt specifically with the exclusionary rule in the context of unreasonable searches and seizures. 116 N.M. at 444, 863 P.2d at 1065. It is well established that Article II, Section 10 of the New Mexico Constitution—our search and seizure provision—"has been construed to provide broader protections than the Fourth Amendment for the past fifteen years." *State v. Granville*, 2006-NMCA-098, ¶ 14, 140 N.M. 345, 142 P.3d 933. Although *Gutierrez* affords an individual a constitutional right to application of the exclusionary rule, it does so in the context of search and seizure and is silent with respect to the privilege against self incrimination.

**{28}** Defendant argues that if interrogators are not required to clarify whether a suspect is invoking his right to remain silent, they will be effectively encouraged to "withhold *Miranda* warnings and . . . thus weaken Article II, Section 15 of the New Mexico Constitution." Defendant's argument is essentially about deterrence: investigators will only refrain from violating a suspect's right to remain silent if the evidence obtained as the result of a violation is excluded. We disagree.

**{29}** *Gutierrez* made it clear that by affording greater protection under Article II, Section 10, the Court was focused "not on deterrence or judicial integrity." 116 N.M. at 446, 863 P.2d at 1067. Instead, the focus was "to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure." *Id.* Defendant does not explain how a suspect's right to remain silent is effectuated by the imposition of a second set of constitutional requirements after investigators have complied with *Miranda*. Defendant merely contends that "warning suspects of their rights can hinder the gathering of evidence."

**{30}** There is no dispute in the present case that the detectives provided Defendant with the constitutionally required warnings. Even in the absence of a state constitutional rule that mandates clarification, the detectives complied with *Miranda*. In fact, the detectives appear to have engaged in clarification similar to that which Defendant argues is necessary. When Defendant informed the detectives that he did not have "too much to say," one of the detectives followed up with, "Well, with the stuff that you do have to say do you mind talking to us about it[?]" Defendant does not provide us with other evidence or argument to support his theory that additional state constitutional requirements are necessary in order to preserve the right to remain silent. Defendant does not conduct a survey of other states to determine if they have clarification requirements and neither will we.

**{31}** Defendant does not argue that the remaining *Gomez* criteria apply—that the federal

9

analysis is flawed or that there is a structural difference between the state and federal governments. 1997-NMSC-006, ¶ 19. Accordingly, we conclude that Defendant has not demonstrated that Article II, Section 15 of the New Mexico Constitution requires investigators to clarify whether a suspect has invoked the right to remain silent.

## B.    Jury Instructions

**{32}**    Defendant proffered jury instructions at trial that related to involuntary manslaughter, duress, and accomplice liability.  The trial court refused to give these instructions.  We review de novo a trial court's denial of jury instructions.  *State v. Ellis*, 2008-NMSC-032, ¶ 14, 144 N.M. 253, 186 P.3d 245.

### 1.    Involuntary Manslaughter

**{33}**    Defendant requested an instruction on the theory of involuntary manslaughter as a lesser-included offense of second degree murder.  "A defendant is entitled to an instruction on a lesser included offense when there is some view of the evidence pursuant to which the lesser offense is the highest degree of crime committed, and that view [is] reasonable." *State v. Gaitan*, 2002-NMSC-007, ¶ 11, 131 N.M. 758, 42 P.3d 1207 (internal quotation marks and citation omitted).

**{34}**    "Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion." *Id.* (internal quotation marks and citation omitted).  The *Gaitan* Court explained that "[t]he difference between second degree murder and voluntary manslaughter is that voluntary manslaughter requires sufficient provocation." *Id.* Defendant contends, pursuant to *State v. Franklin*, 78 N.M. 127, 129, 428 P.2d 982, 984 (1967), and *State v. Boyer*, 103 N.M. 655, 658-60, 712 P.2d 1, 4-6 (Ct. App. 1985), that the circumstances of the car accident were sufficient to establish provocation justifying an involuntary manslaughter instruction.  The State argues that it is not reasonable to view the car accident as sufficient provocation for a fatal shooting, particularly because Defendant caused the accident by driving without headlights, speeding, and running the stop sign.  We agree with the State that without contrary evidence in the record, the trial court properly denied Defendant's requested instruction on involuntary manslaughter.

### 2.    Duress

**{35}**    Defendant submitted an instruction on duress as a defense to the kidnapping charge. In order to warrant a jury instruction on the defense of duress, "a defendant must make a prima facie showing that he was in fear of immediate and great bodily harm to himself or another and that a reasonable person in his position would have acted the same way under the circumstances." *State v. Castrillo*, 112 N.M. 766, 769, 819 P.2d 1324, 1327 (1991), *modified on other grounds by State v. Baca*, 114 N.M. 668, 675, 845 P.2d 762, 769 (1992). Defendant's proffered instruction was based on the theory that at the time Liebschwager's van was commandeered, he was under threat of great bodily harm.  Defendant argues that

the threat stemmed from the following facts: (1) Hawkins hit Defendant with the gun after Nellos was shot, (2) Defendant tried to run away from Hawkins but Hawkins stopped him, (3) Hawkins had the gun at the time of the kidnapping, and (4) Hawkins pushed Defendant into Liebschwager's van.

**{36}** The trial court refused the instruction, explaining that Defendant had not provided sufficient evidence to establish the elements of duress and that "there was sufficient time between the actual threat by . . . Hawkins to [D]efendant . . . to allow a reasonable person to have many alternatives or options available to that person [other than] the actual kidnapping in order to get away or not participate in the actual event." We turn to the evidence presented in order to evaluate whether Defendant provided sufficient evidence to justify an instruction on duress. *See id.* ("If the evidence supports a theory of the case, a defendant is entitled to instruction on that theory.").

**{37}** As we explained, Defendant argues that after the shooting, Hawkins first beat him and then fled, commanding Defendant to follow. Soon afterward, the men encountered Liebschwager, and Hawkins pushed Defendant into the van. During the ride with Liebschwager, Hawkins had the gun. Defendant contends that it "stretches reason to believe that a person who had been beaten with a gun and ordered to follow the person who had just beaten you when that person still had the gun would be acting under anything other than compulsion."

**{38}** The State argues Defendant's rendition of the facts is not supported by the testimony received at trial. After reviewing the testimony, we agree with the State that the evidence at trial did not support the defense of duress. There is no dispute that Hawkins hit Defendant with the gun. Defendant attempts to frame the incident as creating a fear of further great bodily harm because "Hawkins had already demonstrated that he was willing to beat [Defendant] with a gun in order to gain his acquiescence in their escape plan." Hawkins' testimony, however, does not support this characterization of the events. Instead, Hawkins testified that he hit Defendant because Defendant "ruined [Hawkins'] life" by shooting Nellos. There is no indication in the testimony that Hawkins was trying to force Defendant to take a certain course of action or to "gain his acquiescence."

**{39}** The testimony also reflects that Defendant ran in a different direction after Hawkins hit him. What is reflected in the record is Defendant's contention that Hawkins "ordered" Defendant to follow. Instead, it appears that when Defendant began to run away, Hawkins told him that he was "going toward the scene" and "to come with me[,] [t]o follow me." After that, the two men ran together. There is no support for a theory that Hawkins forced Defendant to follow along—it appears instead that Defendant was confused and that Hawkins tried to lead him away from the scene of the crime.

**{40}** Liebschwager testified that when Defendant and Hawkins commandeered her van, it did not appear that Hawkins forced Defendant into the van. Although Hawkins apparently shoved Defendant into the van, both men were having difficulty operating the passenger

11

doors because they were equipped with child locks. When Defendant was able to open the front passenger door, he went over the console into the backseat. Hawkins did not point the gun at Defendant. During the ride, Defendant gave Hawkins the driving directions, and Hawkins passed them on to Liebschwager. When Hawkins got out of the van, Defendant moved to the front seat and continued to give Liebschwager driving directions.

**{41}** "The keystone of the [duress] analysis is that the defendant must have no alternative—either before or during the event—to avoid violating the law." *State v. Rios*, 1999-NMCA-069, ¶ 17, 127 N.M. 334, 980 P.2d 1068 (internal quotation marks and citations omitted). Defendant's position is that he got into the van and participated in the kidnapping because he was in imminent fear of great bodily harm. The testimony does not support Defendant's contention that he was left with no alternative. Defendant was required to demonstrate "some reasonable nexus between the harm feared and the crime that was committed in response to that fear." *Castrillo*, 112 N.M. at 772, 819 P.2d at 1330. Although Defendant would like there to be an inference of fear from Hawkins' actions, the testimony does not provide this nexus. The beating and the kidnapping happened close together in time, but Defendant did not establish that Hawkins hit him with the gun to coerce him into escaping, and there was no testimony that Hawkins threatened Defendant with violence if he did not get into the van. Additionally, Defendant appears to have willingly followed Hawkins after the beating in order to avoid capture at the scene of the accident. Defendant participated in the kidnapping with no signs of coercion or fear: he climbed into the backseat of the van, provided directions, and remained in the van after Hawkins left. Accordingly, we hold that the trial court properly denied Defendant's requested duress instruction.

### 3. Accomplice Liability

**{42}** Defendant submitted two instructions relating to accomplice liability. Defendant first tendered a modified version of UJI 14-2822 NMRA, which addresses aiding and abetting an underlying crime. The modified instruction read as follows:

> The defendant may be found guilty of a crime even though he himself did not do the acts constituting the crime, if the state proves to your satisfaction beyond a reasonable doubt that:
>
> 1.     The defendant intended that the crime be committed;
>
> 2.     The crime was committed;
>
> 3.     The defendant helped, encouraged or caused the crime to be committed.
>
> 4.     The defendant's intent must be the intent that is specified in the specific elements instruction for the crime itself.

12

The trial court rejected this instruction, and instead gave the unmodified version of UJI 14-2822, which differs only by omitting all of the language in "4." Defendant argues that the unmodified instruction permits the jury to "find a lesser intent than what the crime requires." We disagree.

**{43}** In *State v. Carrasco*, 1997-NMSC-047, 124 N.M. 64, 946 P.2d 1075, our Supreme Court explained that "an accessory must share the criminal intent of the principal" and that the requisite intent "can be inferred from behavior which encourages the act or which informs the confederates that the person approves of the crime after the crime has been committed." *Id.* ¶ 7. Most notably, the Court stated that the uniform jury instruction for accessory liability, UJI 14-2822, "incorporates the intent requirement and correctly states the standard for a finding that a defendant is guilty as an accessory." *Carrasco*, 1997-NMSC-047, ¶ 7. Thus, our Supreme Court concluded that UJI 14-2822—the instruction given by the trial court in the present case—is sufficient to direct the jury on the issue of intent in accessory cases. *Carrasco*, 1997-NMSC-047, ¶ 9.

**{44}** Defendant contends that the holding in *Carrasco* should be reevaluated because the jury in his case expressed confusion about the intent requirement. During deliberations, the jury sent two questions to the trial court regarding intent. The jury asked (1) whether "knowledge of the crime before or during the commission of the crime [is] an intent or encouragement that a crime be committed" and (2) whether "[i]f . . . person A knows that person B is going to commit a crime and person A continues close association with person B throughout the crime, does that equate intent?" After discussion with the parties, the trial court responded to the jury's questions with the following statement: "Please review the elements instruction for each crime . . . in combination with all other instructions."

**{45}** "There is a presumption that the jury follows the instructions they are given." *State v. Sellers*, 117 N.M. 644, 650, 875 P.2d 400, 406 (Ct. App. 1994). Defendant is concerned that "the jury in this case could easily have viewed [Defendant's] proximity to . . . Hawkins as dispositive that [Defendant] knew what the consequences of Hawkins' actions would be instead of being required to find that [Defendant] had the identical intent of . . . Hawkins." We are unpersuaded. UJI 14-2822 directs that in order to find accomplice liability, the defendant must have intended "that the crime be committed." After the trial court answered the jury's questions, we presume that the jury looked to the element instruction for each crime in order to determine the intent required for the underlying crime. Accordingly, we see no error in the trial court's refusal to modify UJI 14-2822, and we have no reason to revisit *Carrasco*.

**{46}** Defendant also proffered UJI 14-2823 NMRA, which instructs that

> [m]ere presence of the defendant, and even mental approbation, if unaccompanied by outward manifestation or expression of such approval, is insufficient to establish that the defendant aided and abetted a crime.

13

However, the evidence of aiding and abetting may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs or by any means sufficient to incite, encourage or instigate commission of the crime.

The trial court denied this instruction as well. Defendant was, however, permitted to argue to the jury that the State was required to prove that he had the same specific intent that was required by the underlying crime. Defendant argues that in light of the jury's questions, because UJI 14-2823 was refused, "it is highly likely that the jury found [Defendant] guilty based on a lower standard of intent." We disagree.

**{47}** The use note accompanying UJI 14-2823 states that "[n]o instruction on this subject shall be given." Our Supreme Court has refused to find error when a trial court follows the mandates dictated by the use notes to uniform jury instructions. *State v. Smith*, 2001-NMSC-004, ¶¶ 26-28, 30, 130 N.M. 117, 19 P.3d 254. In addition, *Smith* specifically addresses UJI 14-2823. *Smith*, 2001-NMSC-004, ¶¶ 30-31. The Court explained that the essential elements instructions for the underlying crimes, together with the instruction that "[t]he burden is always on the state to prove guilt beyond a reasonable doubt," were sufficient to "have prevented the jury from finding [the d]efendant guilty of these crimes based on . . . mere presence at the crime scene." *Id.* ¶ 31.

**{48}** In the present case, Defendant does not argue that he did not receive the essential elements instructions for the underlying crimes—only that those instructions were insufficient to clearly convey the necessary intent to convict. Based on *Smith*, we hold that the State was properly required to prove every element of the charges beyond a reasonable doubt and that the essential elements instructions given by the trial court prevented the jury from convicting Defendant without finding the requisite intent.

## C. Prosecutorial Comments

**{49}** During its closing argument, the State said to the jury, "[d]on't point a gun to something you don't want to shoot, and don't shoot at something you [don't] intend to kill." Defendant objected. The trial court requested that counsel approach the bench where Defendant argued that the statement was "a complete misstatement of the law and the facts that came out of this case." Defendant then moved for a mistrial or, in the alternative, a curative instruction. The trial court first denied the motion for a mistrial and stated that it would "now advise the jury to disregard [the comment]." The State argued against the instruction. The trial court then stated that it was "not sustaining the objection." No curative instruction was given. On appeal, Defendant argues that the comment permitted the jury to convict without finding the requisite intent and thus lowered the State's burden of proof.

**{50}** We review the denial of a motion for mistrial or a curative instruction for abuse of discretion. *State v. Chamberlain*, 109 N.M. 173, 177, 783 P.2d 483, 487 (Ct. App. 1989). In addition, we consider "comments made in closing argument in the context in which they

14

occurred so that we may gain a full understanding of the comments and their potential effect on the jury." *Smith*, 2001-NMSC-004 ¶ 38 (internal quotation marks and citation omitted). "[R]emarks by the prosecutor must be based upon the evidence or be in response to the defendant's argument." *Id.* The State argues that the comment was an argument attacking Defendant's theory of the case and not a misstatement of the law designed to lower the burden of proof. We agree with the State.

**{51}** At trial, Defendant's theory was that when he fired the gun, he did not intend to kill Nellos but rather to shoot him in the leg. The State's comments in closing argument were arguably designed to raise an inference of intent to kill based on the fact that Defendant pointed a gun at Nellos. *See State v. Silva*, 2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192 (explaining that "[i]ntent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence" (alteration in original) (internal quotation marks and citation omitted)); *State v. Diaz*, 100 N.M. 210, 213-15, 668 P.2d 326, 329-31 (Ct. App. 1983) ("In jury arguments a prosecutor must confine himself to the facts introduced in evidence and to the fair and reasonable inferences to be drawn therefrom.").

**{52}** Defendant argues that the comments in this case were similar to those made by the prosecutor in *Diaz*. In *Diaz*, this Court considered numerous comments by the prosecutor and concluded that he "made improper remarks to the jury, in that 1) he made overextensive references to the authority he represents, 2) he improperly made vituperative remarks about [the] defendant, and 3) he derogated the defense of intoxication." *Id.* at 215, 668 P.2d at 331. Thus, this Court held that the remarks "amounted to cumulative error," and the defendant's convictions were reversed. *Id.* Defendant makes no similar cumulative-error argument in the present case, so the holding in *Diaz* therefore is not instructive.

**{53}** Defendant, however, focuses on this Court's determination that a specific comment in *Diaz*, regarding the likely adverse effect on the community if the jury were to find that the defendant could not form the requisite intent, was a misstatement of the law and an improper attempt to instruct the jury. *Id.* at 214, 668 P.2d at 330. This comment was not a response to the merits of the defendant's affirmative defense. *Id.* Instead, the statement was a message to the jury "to disregard the defense even if they find it meritorious." *Id.* The comment in the present case had no such message for the jury. The prosecutor used a fact—that Defendant pointed a gun and shot the victim—in order to argue that the jury should infer an intent to kill. We therefore determine *Diaz* to be inapposite and hold that the trial court did not abuse its discretion when it refused to declare a mistrial and failed to offer a curative instruction.

## D.    Sufficiency of the Evidence

**{54}** Defendant makes two arguments related to the sufficiency of the evidence: (1) the evidence did not support his convictions, and (2) the evidence did not support a habitual offender enhancement. "When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the [s]tate; we resolve all conflicts and indulge all

15

permissible inferences in favor of the verdict." *State v. Neatherlin*, 2007-NMCA-035, ¶ 8, 141 N.M. 328, 154 P.3d 703. Defendant raises these issues pursuant to *Franklin*, 78 N.M. at 129, 428 P.2d at 984, and *Boyer*, 103 N.M. at 658-60, 712 P.2d at 4-6.

**{55}** With regard to the sufficiency of the evidence to support the convictions, Defendant makes no argument at all. He points to no particular facts that were not supported by evidence. *See* Rule 12-213(A)(4) NMRA ("A contention that a verdict, judgment or finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence[.]"); *State v. Mora*, 2003-NMCA-072, ¶ 28, 133 N.M. 746, 69 P.3d 256 ("No claim is made that the evidence does not support proof as to any specific required element of the offenses charged."). Absent articulation of particular facts that are not supported by substantial evidence, we affirm the jury's verdict. *See Mora*, 2003-NMCA-072, ¶ 28.

**{56}** Defendant also challenges the evidence supporting the enhancement of his sentence. In order to enhance a sentence pursuant to NMSA 1978, Section 31-18-17 (2003), the State must establish that Defendant is the same person convicted of a prior felony and that "less than ten years have passed since [D]efendant completed serving his or her sentence, probation or parole for the conviction." *State v. Simmons*, 2006-NMSC-044, ¶ 8, 140 N.M. 311, 142 P.3d 899. These factors must be proved by a preponderance of the evidence. *Id.* ¶ 10.

**{57}** Defendant disputes that the State adequately established that he was the same person convicted of the felonies listed in the judgments offered by the State in order to prove the prior felonies. The State provided the trial court with certified judgments and sentences from Illinois, which listed the same name as Defendant's and included a date of birth. A detective testified that Defendant told him that he had come from Illinois and, additionally, that the date of birth reported by Defendant was the same date on the judgments. Finally, a fingerprint expert matched Defendant's fingerprints to those taken by the federal authorities in conjunction with the incidents from Illinois. We hold that the State provided sufficient evidence for the trial court to determine by a preponderance of the evidence that Defendant was the same individual named in the Illinois judgments.

## III. CONCLUSION

**{58}** We affirm the trial court.

**{59}** **IT IS SO ORDERED.**

_____
**CELIA FOY CASTILLO, Judge**

**WE CONCUR:**

16

**JONATHAN B. SUTIN, Judge**


**TIMOTHY L. GARCIA, Judge**


**Topic Index for *State v. Perry*, No. 26,842**

| | |
|---|---|
| **AT** | **ATTORNEYS** |
| AT-CT | Comments by Attorneys at Trial |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-MS | Misconduct by Prosecutor |
| CT-NM | New Mexico Constitution, General |
| CT-SL | Self-incrimination |
| CA-SE | Substantial or Sufficient Evidence |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-JI | Jury Instructions |
| CA-MR | Motion to Suppress |
| CA-SI | Self-incrimination |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-DS | Duress |
| CL-HO | Homicide |
| CL-VM | Voluntary Manslaughter |