202

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM CHARLES HORTON, JR., *Appellant*.

204

*Catherine E. Glinski* (of *Glinski Law Firm PLLC*), for appellant.

*Mark E. Lindquist*, *Prosecuting Attorney*, and *Chelsey L. Miller*, *Deputy*, for respondent.

¶1  MELNICK, J. — William Charles Horton Jr. appeals his conviction for unlawful possession of a firearm in the first degree and murder in the first degree. In the published portion of this opinion, we conclude that article I, section 9 of the Washington Constitution does not afford greater protections than the United States Constitution regarding

waiver of counsel and thus, the trial court did not err by admitting Horton's statements. Additionally, we conclude that a Florida "withheld adjudication" properly served as the predicate offense for Horton's unlawful possession of a firearm conviction.

¶2 In the unpublished portion of this opinion, we conclude that the trial court did not abuse its discretion by excluding evidence of the victim's gang affiliation or by declining to instruct the jury on manslaughter. We also conclude that Horton cannot establish his prosecutorial misconduct claim, and as a result, his ineffective assistance of counsel claim also fails. Finally, we conclude that Horton's cumulative error claim is unsupported because he received a fair trial.

¶3 We affirm the trial court.

## FACTS[1]

I. THE CRIME

¶4 In the early morning of October 24, 2012, police responded to a dispatch call. Dispatch reported that shots were fired and that a witness saw a black male dragging another black male toward the street. When Sergeant Matt Brown and Officers Ryan Moody, Timothy Borchardt, and Noah Dier arrived, they observed what they later discovered to be the dead body of Charles Pitts in the middle of the parking lot.

¶5 Before the officers could approach the body, a man, later identified as Horton, ran into the parking lot carrying a gun and yelling. Horton yelled, "I'm going to kill you, m*****f***er" and stood over the body. 4 Report of Proceedings (RP) at 209. The police announced their presence and ordered Horton to get on the ground. Horton obeyed,

---

[1] In the published portion of this opinion, we include only the facts necessary to decide the published issues. Additional facts are included in the unpublished portion.

dropped the gun, and got down on the ground next to the body. The police placed him in handcuffs. Horton was wearing a Chicago Bears jacket. Pitts's shirt was partially pulled over his head, and there was a bullet hole below his navel and a bullet hole in his chest. The police took the gun Horton dropped into evidence and noted the chamber was partially open with a bullet casing lodged inside.[2]

¶6 While officers placed Horton in handcuffs, Horton said to an officer, "They're not involved. I'm the only suspect." 4 RP at 237. Horton appeared to be referring to people standing outside nearby apartments. Horton also looked at the deceased, while laughing and stated, "That m*****f***er is dead." 4 RP at 238.

¶7 Horton was put in Officer Mark Holthaus's patrol car because it had an in-car video camera. Before Holthaus could advise Horton of his *Miranda*[3] rights, Horton stated the guy in the parking lot "was part of the Hilltop Crips and that's what did it." 5 RP at 355. Holthaus then read Horton his *Miranda* rights. Horton acknowledged that he understood his rights, but Holthaus did not question him. According to one officer, before Horton got in Holthaus's car, Horton told officers his leg and back were injured. The video of Horton in the back of the car was later admitted into evidence at Horton's trial and viewed by the jury.

¶8 Holthaus transported Horton to the police station where Investigator Sean Conlon took custody of him. At the station, Conlon read Horton his *Miranda* rights a second time and then conducted a video recorded interview after Horton indicated he understood his rights and was willing to waive his rights and talk. Horton admitted to shooting Pitts, but at times throughout the interview he indicated it was in self-defense.

---

[2] According to officers, the weapon malfunctioned and caused this occurrence. The weapon was a semiautomatic pistol.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶9  Officers identified the apartment tied to the events of the night and secured it, along with the tenant, Baron Johnson, who was standing nearby or inside the apartment. Officer Moody noted blood on the floor by the entryway. He also smelled a "fairly strong" odor of marijuana. 5 RP at 330. The blood indicated something had been dragged from inside the apartment to the outside. Two spent shell casings were located inside the apartment. Officers also recovered a black bag from the parking lot near where Pitts's body was found and where Horton had been taken into custody. The bag contained marijuana and 10 blue tablets, which appeared to be ecstasy.[4]

¶10  In events leading up to the shooting, Horton, Johnson, Gregory Borja, Anthony Ross, and Alonza Williams gathered at Johnson's apartment. After drinking and barbecuing at the apartment, the group went to a night club. Johnson and Borja saw Pitts outside of the club. Johnson and Ross also saw Horton with a gun at some point that day.

¶11  The group drank and stayed at the club until about 1:30 AM, when they returned to Johnson's apartment. Horton, Ross, Borja, and Williams rode in a car together. Pitts also showed up at the apartment shortly after the group arrived.

¶12  According to Johnson, Horton wanted to "slap box" with Pitts. 5 RP at 397. Borja said that everyone was having a good time, and Horton and Pitts were briefly slap boxing but were playing around. Borja thought that Pitts "got the better hand" of Horton once. 9 RP at 1085. Ross said that Horton and Pitts were in each other's faces and "smack talking." 8 RP at 1006.

¶13  Horton and Pitts were intoxicated. Johnson described Horton's level of intoxication at the club earlier as "pretty up there," and confirmed that meant drunk. 5 RP at 492. He had heard that Horton was on Ecstasy but did not see him take it.

---

[4] Methylenedioxymethamphetamine.

¶14 According to Horton, he did not slap box with Pitts. Horton said Pitts came into the apartment and began calling him "cuz." 11 RP at 1476, 1479. Pitts asked him about his Chicago Bears jacket, its black and orange colors, and whether he was a "Hoover."[5] 11 RP at 1480. Horton stated that Pitts remarked on the colors of Horton's jacket in "his neighborhood" and asked him, "What you doing with the colors on over here, Cuz; are you from Hoover or something?" 11 RP at 1480. Pitts hit Horton, and Horton stated, "I've never been hit that hard in my life. It was one of those hits that I remember to this day. I ain't never been hit like that." 11 RP at 1484. About a week before Pitts's death, Horton saw Pitts beat up another person to the point where the other guy's "face looked like a punkin." 11 RP at 1496. Horton said, "I knew what this man was capable of and I was in fear for my life. I believe that man said he was going to kill me." 11 RP at 1497.

¶15 Johnson went into his bedroom. At some point shortly thereafter, Borja got a bad feeling when Horton began talking about being a Black Gangster Disciple from Chicago and thought it was time to go. Borja, Ross, and Williams left the apartment.

¶16 While Johnson was in his bedroom, Horton shot Pitts in the living room. Johnson did not see the first shot but said he ran into the living room to see smoke coming out of Pitts's abdomen and Horton shooting Pitts again. Johnson believed Horton said, "You can't do nothing to me now. You're dead," before shooting Pitts again three more times. 5 RP at 431. Horton was not wearing shoes or a shirt.

¶17 According to Horton, Johnson told him to get Pitts out of the house. Horton told Johnson he would take care of it and began to drag Pitts outside. Horton came back to the apartment to get his shoes and jacket, and when he ran back to Pitts in the parking lot, the police had arrived.

---

[5] Based on testimony at trial, this was a gang name reference. Conlon also testified that California Hoover Crips are sometimes confused for Chicago Gangster Disciples, which are entirely separate.

## II. THE FIRST TRIAL

¶18 On October 25, 2012, the State charged Horton by information with murder in the first degree with a firearm enhancement and unlawful possession of a firearm in the first degree.[6] The State also charged a gang aggravator for both crimes.[7]

### A. Hearing on Admissibility of Defendant's Statements

¶19 On March 18, 2014, prior to the start of trial, the trial court conducted a hearing pursuant to CrR 3.5. The State presented testimony from Sergeant Brown and Officers James Syler, Dier, Holthaus, and Conlon. The trial court ruled that the statements Horton made during his arrest and while speaking with Conlon were admissible in the State's case in chief. The court entered written findings of fact.

¶20 In pertinent part, the trial court found that Horton was advised of his *Miranda* rights, and that Horton understood his rights and waived them. The court also found that after being transported to the police station, the police put Horton in a recorded interview room. They provided notice to Horton about the recording, and again advised him of his *Miranda* rights. Horton stated he understood his rights and was willing to waive them and speak with Conlon. Horton signed the advisement of rights form. The court further found,

> Shortly after being advised of his *Miranda* rights, [Horton] made a comment, "I do have a lawyer." The investigator asked what the defendant meant and he responded, "I don't have a lawyer." The investigator asked "What did you have a lawyer for?" The defendant responded "why would I have a lawyer?"

---

[6] RCW 9A.32.030(1)(a); RCW 9.41.010; RCW 9.94A.530, .533.

[7] RCW 9.94A.535(3)(aa) (aggravated by committing the offense with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang), .030.

> The investigator asked if the defendant was referring to a previous case and the defendant responded, "naw, naw, I didn't have no lawyer for a previous case. But I do have lawyers . . . but I'm just saying, this guy right here man [referencing the victim] . . . fuck shit man." The defendant then proceeded to talk about the events that transpired that night. At no other point did the defendant reference an attorney or otherwise suggest that he was invoking his right to an attorney or his right to remain silent.

Clerk's Papers (CP) at 205.

¶21 From its findings, the trial court concluded that Horton's statements on October 24, 2012, were admissible. The court also concluded that Horton's statements made to Conlon after arriving at the station followed two full advisements of his *Miranda* rights and that Horton knowingly, voluntarily, and intelligently waived his rights and spoke with officers. The court further concluded that the comments regarding a lawyer "were not . . . unequivocal requests for an attorney that invoked the right to counsel." CP at 206. Instead, the comments were

> unclear, contradictory, and required clarification. The court reach[ed] this conclusion based on the entire context and totality of [Horton's] actions. This include[ed] but [was] not limited to his repeated eagerness to talk to law enforcement that night, his express statement to Investigator Conlon that he knew he could "shut up" and not talk about what happened, and the fact that he could not be referring to an attorney he had secured on this matter since he did not have an opportunity from the time of the shooting to retain counsel.

CP at 206-07.

### B. Pretrial Motions in Limine

¶22 Pretrial, the State provided Horton notice of its intent to use Horton's prior armed robbery conviction in Florida. The State said it would use the Florida robbery conviction as the predicate offense for the unlawful possession of a firearm charge. Horton filed a motion to exclude it.

¶23 At the pretrial hearing on this motion, the State argued that the defense was really arguing a *Knapstad*[8] motion, not an ER 609 motion. The trial court stated the issue needed to be adequately briefed. Horton then filed a brief in support of his motion to exclude evidence of the Florida conviction because it was a withheld adjudication.[9] He asked the trial court to conclude that a withheld adjudication was not a prior conviction for the purposes of a predicate offense for unlawful possession of a firearm. The State filed a response and again referred to Horton's motion as a *Knapstad* motion. Defense counsel acknowledged during argument, "I'm essentially, as the State asserted, arguing a *Knapstad* motion as part of a 609 motion because I didn't brief a *Knapstad.*" RP (Mar. 18, 2014) at 166.

¶24 The trial court denied Horton's motion to exclude. It found that "a plea of guilty combined with adjudication withheld in the state of Florida would be considered a conviction for purposes of a predicate offense for the unlawful possession of a firearm statute in the state of Washington." RP (Mar. 25, 2014) at 4.

C. Trial

¶25 The case proceeded to trial. Horton stipulated that exhibit 10-B was a certified copy of his withheld adjudication from Florida. At trial, the court admitted exhibit 10-B. The document established that Horton pleaded guilty to armed robbery and that the Florida court entered a withheld adjudication.

¶26 The trial court instructed the jury as follows: "You have heard evidence that the defendant pled guilty to

---

[8] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

[9] Fla. Stat. § 948.01(2) states, "If it appears to the court upon a hearing of the matter that the defendant is not likely again to engage in a criminal course of conduct and that the ends of justice and the welfare of society do not require that the defendant presently suffer the penalty imposed by law, the court, in its discretion, may either adjudge the defendant to be guilty or stay and withhold the adjudication of guilt. In either case, the court shall stay and withhold the imposition of sentence upon the defendant and shall place a felony defendant upon probation."

Armed Robbery and that the court imposed a sentence of 'adjudication withheld.' You may consider this evidence only for the purpose of [unlawful possession of a firearm]. You must not consider this evidence for any other purpose." CP at 303 (Instr. 20). It also instructed the jury, "A person commits the crime of unlawful possession of a firearm in the first degree when he has previously been adjudicated guilty as a juvenile of a serious offense and knowingly owns or has in his possession or control any firearm." CP at 304 (Instr. 21). And, the court instructed the jury that "[a] guilty plea to the charge of armed robbery, in the State of Florida, with a sentence of 'adjudication withheld' as a juvenile, is an adjudication of guilty to a serious offense." CP at 305 (Instr. 22).

¶27 The "to convict" instruction for unlawful possession of a firearm stated,

> To convict the defendant of the crime of Unlawful Possession of a Firearm in the First Degree as charged in count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 24th day of October, 2012, the defendant knowingly owned a firearm or had a firearm in his possession or control;
>
> (2) That the defendant had previously been adjudicated guilty as a juvenile of a serious offense; and
>
> (3) That the ownership, or possession or control of the firearm occurred in the State of Washington.

CP at 309 (Instr. 26).

¶28 The jury found Horton guilty of unlawful possession of a firearm in the first degree but did not reach a verdict on the murder charge. The jury also did not return an answer on the special verdict form for the gang aggravator.

III. The Second Trial

¶29 The State retried Horton on the murder in the first degree charge and the gang aggravator, and the jury re-

turned a guilty verdict for murder in the first degree and found that Horton was armed with a firearm. The jury also found that the gang aggravator was proven. The court entered findings of fact and conclusions of law and imposed an exceptional sentence. It sentenced Horton to 481 months of confinement and 36 months of community custody.

¶30 Horton appeals.

## ANALYSIS

I. HORTON'S OUT-OF-COURT STATEMENTS

¶31 Horton argues the trial court erred by admitting his statements to Conlon at the police station after Horton received his *Miranda* warnings.[10] We disagree.

### A. Standard of Review

¶32 The Fifth Amendment to the United States Constitution protects a defendant against self-incrimination. Article I, section 9 of the Washington Constitution states, "No person shall be compelled in any criminal case to give evidence against himself." "*Miranda* warnings were developed to protect a defendant's constitutional right not to make incriminating confessions or admissions to police while in the coercive environment of police custody." *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). "Without *Miranda* warnings, a suspect's statements during custodial interrogation are presumed involuntary." *Heritage*, 152 Wn.2d at 214.

¶33 The government bears the burden of showing, by a preponderance of the evidence, that the suspect understood his rights and voluntarily waived them. *State v. Radcliffe*, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008). Once waived, a suspect may ask for an attorney at any time. *Radcliffe*, 164 Wn.2d at 906. If he requests an attorney, all

---

[10] Horton does not contest the admission of his statements to the officers in the parking lot.

questioning must stop until he has an attorney or starts talking again on his own. *Radcliffe*, 164 Wn.2d at 906. The suspect's request for an attorney must be unequivocal; an equivocal request is insufficient. *Radcliffe*, 164 Wn.2d at 906-07.

■■ ¶34 We treat unchallenged findings of fact following a CrR 3.5 hearing as verities on appeal. *State v. Lorenz*, 152 Wn.2d 22, 30, 93 P.3d 133 (2004). We review whether the trial court derived proper conclusions of law from its findings of fact de novo. *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008), *adhered to on remand*, 158 Wn. App. 272, 246 P.3d 196 (2010).

B. Right to Counsel

¶35 Horton argues that under article I, section 9 of the Washington State Constitution, Conlon should have inquired further into his invocation of the right to counsel after he said the word "lawyer" and that as a result, the trial court erred by admitting his statements. Horton does not assign error to the trial court's CrR 3.5 hearing findings of fact. Therefore, we consider the findings of fact as verities. *Lorenz*, 152 Wn.2d at 30.

¶36 Here, the trial court found that when Horton stated in the interview room, "I do have a lawyer," "I don't have a lawyer," "[W]hy would I have a lawyer?", and "I do have lawyers," he was neither invoking his right to counsel nor his right to remain silent. CP at 205. The court concluded the "unclear" and "contradictory" statements "were not an unequivocal request for an attorney." CP at 206.

¶37 Horton does not argue that under the Fifth Amendment to the United States Constitution, his right to counsel was violated. Instead, Horton contends that article I, section 9 of the Washington State Constitution affords greater protections than the Fifth Amendment and therefore, the trial court should have applied the standard set forth in *State v. Robtoy*, 98 Wn.2d 30, 39, 653 P.2d 284 (1982) (holding a suspect's equivocal request for an attorney for-

bids further questioning), rather than that in *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (holding only an unequivocal request to speak to an attorney, after waiver of the right, mandates an end to police interrogation). He argues that a *Gunwall*[11] analysis is appropriate and asserts that Washington courts have not answered whether *Robtoy* applies under article I, section 9 of the Washington State Constitution.

■■ ¶38 A *Gunwall* analysis is not appropriate in this case. Our Supreme Court recommended that courts analyze six, nonexclusive criteria to determine whether a particular provision of the Washington Constitution affords broader rights to its citizens than the United States Constitution does. *Gunwall*, 106 Wn.2d 54. The six criteria are (1) the textual language, (2) differences in the texts, (3) constitutional history, (4) preexisting state law, (5) structural differences, and (6) matters of particular state or local concern. *Gunwall*, 106 Wn.2d at 58. "A determination that a given state constitutional provision affords enhanced protection in a particular context does not necessarily mandate such a result in a different context." *State v. Russell*, 125 Wn.2d 24, 58, 882 P.2d 747 (1994). However, our Supreme Court has already determined that the state constitution's article I, section 9 is coextensive with the Fifth Amendment. *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). It is not broader. *Earls*, 116 Wn.2d at 374-75.

■ ¶39 In *Earls*, our Supreme Court decided that the defendant "was repeatedly and clearly told of his right to have the assistance of an attorney. He freely, knowingly, and intelligently chose to give up that right and to confess to murder in exchange for a reduced charge." *Earls*, 116 Wn.2d at 380-81. One justice dissented, relying in part on *Robtoy*, 98 Wn.2d 30. *Earls*, 116 Wn.2d at 383-84 (Utter, J., dissenting). The dissent concluded that law enforcement violated Earls's right to counsel because the officers did not act on

---

[11] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

an equivocal invocation of the right to counsel. *Earls*, 116 Wn.2d at 383-84 (Utter, J., dissenting). This reasoning was rejected by the eight other Washington Supreme Court justices. *Earls*, 116 Wn.2d at 380-81. Officers are not required to inquire further when a suspect merely uses the word "lawyer." *See Earls*, 116 Wn.2d at 380-81.

¶40 Horton's arguments are contrary to how Washington courts have consistently ruled, i.e., that the state constitutional protections under article I, section 9 and the federal constitutional protections under the Fifth Amendment are the same. Conlon did not have a duty to inquire further into Horton's statements about lawyers. Additionally, Horton does not argue that under the Fifth Amendment, his right to counsel was violated, nor does he assign error under the Fifth Amendment, thus conceding that his right was not violated under the federal constitution. Horton's claim fails. The trial court did not err.

## II. FLORIDA "WITHHELD ADJUDICATION"

¶41 Horton argues that a Florida "withheld adjudication" does not constitute a predicate offense for the crime of unlawful possession of a firearm in the first degree and, therefore, insufficient evidence existed to convict him. We conclude that in this circumstance the proper standard of review is a de novo legal review, not sufficiency of the evidence. We hold the court did not err.

### A. Standard of Review

¶42 Prior to the start of trial, a defendant may "move to dismiss a criminal charge due to insufficient evidence establishing a prima facie case of the crime charged." CrR 8.3(c).[12] This process is essentially a summary judgment procedure "to avoid a 'trial when all the material facts are not genuinely in issue and could not

---

[12] Subsequent to *Knapstad*, the Supreme Court adopted a court rule outlining the procedures to be employed. *See* CrR 8.3(c)(1). Nonetheless, these motions are often referred to as *Knapstad* motions. We will review this issue under CrR 8.3.

legally support a judgment of guilt.' "[13] *State v. Freigang*, 115 Wn. App. 496, 501, 61 P.3d 343 (2002) (quoting *Knapstad*, 107 Wn.2d at 356). The trial court "shall grant the motion if there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt." CrR 8.3(c)(3). The denial of such a motion is not appealable under RAP 2.2. CrR 8.3(c)(3). However, a defendant is not barred from claiming insufficient evidence at a later stage in the proceedings. *State v. Jackson*, 82 Wn. App. 594, 608, 918 P.2d 945 (1996). We analyze the claim using the most complete factual basis available at the time the claim is made. *Jackson*, 82 Wn. App. at 609.

¶43 Whether or not a conviction can be a predicate offense is a question of law. *State v. Chambers*, 157 Wn. App. 465, 477, 237 P.3d 352 (2010). We review questions of law de novo. *State v. Gardner*, 104 Wn. App. 541, 543, 16 P.3d 699 (2001). We also review questions of statutory construction de novo, looking first to the statute's plain language in order to give effect to legislative intent. *State v. J.P.*, 149 Wn.2d 444, 449-50, 69 P.3d 318 (2003). We must give words in a statute their plain and ordinary meaning. *J.P.*, 149 Wn.2d at 450.

B. Reviewability

¶44 First, the State contends that if we look at this issue as a sufficiency of the evidence claim, Horton failed to designate the appropriate portions of verbatim report of proceedings from the first trial and therefore, we cannot review the issue. Specifically, the State argues that because we do not have the trial record, Horton's conviction could have been based on a different prior conviction.

¶45 However, this argument is without merit. The State informed the court pretrial that the predicate offense for

[13] To properly file this type of motion, it must be in writing and supported by an affidavit or declaration alleging that there are no material disputed facts. CrR 8.3(c)(1). It must set out the agreed facts or be a stipulation to facts by both parties. CrR 8.3(c)(1).

unlawful possession of a firearm "is a conviction out of Florida for robbery." RP (Mar. 18, 2014) at 146. The jury instructions from the first trial also specify the predicate crime was the Florida offense.[14] It is clear from the record that the only predicate offense was the Florida "withheld adjudication." The State has not argued that the record is otherwise insufficient for our review.

¶46 The State also argues that the motion to dismiss was a *Knapstad*, or CrR 8.3 motion, that cannot be appealed.[15] While we agree that denial of a CrR 8.3 motion cannot be appealed, the Superior Court Criminal Rules provide, "These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration, effective justice, and the elimination of unjustifiable expense and delay." CrR 1.2. Additionally, we follow the Rules of Appellate Procedure that state, "These rules will be liberally interpreted to promote justice and facilitate the decision of cases on the merits." RAP 1.2(a). Based on these rules, we exercise our discretion to consider the argument.

¶47 In so doing, however, we must determine the appropriate standard of review. Under a sufficiency of the evidence standard, we determine if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the State. *State v. Ehrhardt*, 167 Wn. App. 934, 943, 276 P.3d 332 (2012). If we are determining the

---

[14] Additionally, in the second trial, Horton filed a motion in limine to preclude the State from discussing his Florida offense, which "constitute[ed] a conviction for the purposes of Count 2." CP at 325. It was an agreed motion, the trial court granted.

[15] For all intents and purposes, Horton's pretrial motion appears to have been a CrR 8.3(c) or a *Knapstad* motion. Defense counsel initially filed it as a motion in limine, but after the trial court stated the issue needed to be adequately briefed, defense counsel filed a brief seeking the dismissal of a charge, in writing, with an attached brief. Additionally, the State treated it as such, as did defense counsel and the court. Horton also did not take the opportunity in his reply brief to this court to refute the State's treatment of the motion as a *Knapstad* motion.

issue as purely a matter of law, then we employ a de novo standard. *Gardner*, 104 Wn. App. at 543. Here, it is clear that Horton is in fact asking for a legal review of whether or not a robbery conviction under Florida's withheld adjudication statute can be a predicate offense for the crime of unlawful possession of a firearm in Washington. Because this issue is a narrowly defined legal issue, we review it de novo.

### C. Unlawful Possession of a Firearm

¶48 The issue of whether or not a Florida withheld adjudication qualifies as a predicate offense for unlawful possession of a firearm is an issue of first impression. The only Washington case addressing Florida's withheld adjudication statute is *State v. Heath*, 168 Wn. App. 894, 279 P.3d 458 (2012). There, the court considered whether "withheld adjudications" should count toward an offender score. *Heath*, 168 Wn. App. at 895. The court reasoned that Heath's no contest pleas were functionally the same as guilty pleas, and that "Washington must count them as convictions, just as Florida does. Even when followed by a withhold of adjudication, they meet the Washington definition of a 'conviction.' "[16] *Heath*, 168 Wn. App. at 900-01. Horton acknowledges this holding but argues that the trial court here improperly determined that his guilty plea to robbery, combined with a withheld adjudication, constituted a conviction for the purposes of the unlawful possession of a firearm statute.

¶49 Under RCW 9.41.040(1)(a), "[a] person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the first degree, if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted or found not guilty by reason of insanity in this state or elsewhere of any

---

[16] The appellate court in *Heath* reviewed two of the trial court's findings after a Florida prosecutor provided expert testimony about "withheld adjudication," and then reviewed the trial court's conclusion of law. 168 Wn. App. at 896-97.

serious offense as defined in this chapter." For the purposes of the statute, "convicted" is defined as follows:

[A] person has been "convicted", whether in an adult court or adjudicated in a juvenile court, *at such time as a plea of guilty has been accepted*, or a verdict of guilty has been filed, notwithstanding the pendency of any future proceedings including but not limited to sentencing or disposition, post-trial or post-fact-finding motions, and appeals. Conviction includes a dismissal entered after a period of probation, suspension or deferral of sentence, and also includes equivalent dispositions by courts in jurisdictions other than Washington [S]tate. A person shall not be precluded from possession of a firearm if the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted or the conviction or disposition has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.

RCW 9.41.040(3) (emphasis added).

¶50 "[I]n Florida, a statute gives the court discretion either to 'adjudge the defendant to be guilty or stay and withhold the adjudication of guilt.' " *Heath*, 168 Wn. App. at 898 (quoting FLA. STAT. § 948.01(2)). Additionally, Florida law defines "conviction" generally "as 'a determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld.' " *Heath*, 168 Wn. App. at 899 (quoting FLA. STAT. § 921.0021(2)).

¶51 Horton argues that because Florida does not consider a "withheld adjudication" a conviction for the purposes of possession of a firearm, Washington courts should do the same. Br. of Appellant at 30. Florida's unlawful possession of a firearm statute, FLA. STAT. § 790.23(1), states it is unlawful for any person who has been convicted of a felony to have in his possession any firearm. Horton cites *Castillo v. State*, 590 So. 2d 458, 461 (Fla. Dist. Ct. App. 1991), where the Florida court held, "For purposes of this statute, we construe 'conviction' to mean an adjudication of guilt." The

court went on to state, "Where adjudication has been withheld, the offender is not a convicted felon." *Castillo*, 590 So. 2d at 461.

¶52 However, Washington courts do not adopt a foreign jurisdiction's interpretation of law. *State v. Stevens*, 137 Wn. App. 460, 465, 153 P.3d 903 (2007). We instead interpret foreign statutes in light of Washington statutes and case law. *Stevens*, 137 Wn. App. at 465. We (1) identify the comparable Washington offense, (2) classify the comparable Washington offense, and (3) treat the out-of-state conviction as if it were a conviction for the comparable Washington offense. *Stevens*, 137 Wn. App. at 465. Because Washington law controls, not the interpretation conducted by another state, we do not look to Florida law but to how Washington law treats the same conduct. *State v. Cameron*, 80 Wn. App. 374, 379, 909 P.2d 309 (1996).

¶53 Furthermore, the plain language of RCW 9.41-.040(3) defines a "conviction" as when "a plea of guilty has been accepted." The statute also provides that a conviction "includes a dismissal entered after a period of probation, suspension or deferral of sentence, and also includes equivalent dispositions by courts in jurisdictions other than Washington [S]tate." RCW 9.41.040(3). We conclude that a plea of guilty combined with a withheld adjudication is a conviction for the purposes of being a predicate offense for unlawful possession of a firearm.[17]

¶54 There is no dispute that Horton pleaded guilty to the armed robbery in Florida. In 1994, Horton pleaded guilty and the court entered a sentence of "adjudication withheld." Horton stipulated to the documents proving his Florida offense at trial. Therefore, we affirm Horton's conviction.

¶55 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the

---

[17] We also previously considered Texas "deferred adjudications" as convictions for the purposes of offender score calculations "because, despite not having 'entered' the[ ] adjudications, the Texas court had accepted [the defendant's] guilty pleas to these charges." *State v. Cooper*, 164 Wn. App. 407, 408, 263 P.3d 1283 (2011), *aff'd*, 176 Wn.2d 678, 294 P.3d 704 (2013).

Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

WORSWICK and LEE, JJ., concur.

Review denied at 187 Wn.2d 1003 (2017).