******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* ROBERT
JOHN PURCELL
(AC 38206)

Alvord, Keller and Dennis, Js.

*Syllabus*

The defendant, who had been convicted of three counts risk of injury to a
child in connection with four separate incidents, appealed to this court,
claiming, inter alia, that the trial court abused its discretion when it
denied his motion for a mistrial after the mother of the minor victim
testified that the victim had been diagnosed with post-traumatic stress
disorder. The defendant also claimed that the court improperly denied
his motion to suppress certain statements that he had made to two
police officers during a custodial interrogation. After the officers advised
the defendant of his constitutional rights, he told them that he had
consulted with an attorney, who advised him not to talk to them about
anything that could be misconstrued as inappropriate or about other
matters pertaining to the victim's allegations. The defendant expressed
to the officers misgivings about his attorney's advice, but continued
talking with them and thereafter stated, inter alia, "See, if my lawyer
was here, I'd . . . we could talk. That's, you know, that's it," and, "I'm
supposed to have my lawyer here. You know that." On appeal, the
defendant claimed that the officers violated his federal and state consti-
tutional rights when they failed to cease questioning him because the
statements at issue constituted clear and unequivocal invocations of his
right to counsel. The defendant further claimed that even if the state-
ments were ambiguous or equivocal, the officers were required under
the article first, § 8, of the state constitution to cease questioning him
and to clarify his statements. The defendant also asserted that the harm-
fulness of the mother's testimony about the victim's diagnosis could not
be cured by the instruction that the court gave to the jury immediately
after the testimony because the diagnosis related to the victim's credibil-
ity, which was crucial to the state's case in light of the lack of physical
evidence that the defendant sexually assaulted the victim. *Held*:

1. This court found unavailing the defendant's claim that the trial court
   abused its discretion in denying his motion for a mistrial, which was
   based on his assertion that the jury's verdict was substantially swayed
   by testimony from the victim's mother that the victim had been diagnosed
   with post-traumatic stress disorder and that the testimony about the
   diagnosis constituted harmful error that could not be cured by the trial
   court's instruction to the jury immediately thereafter: the diagnosis of
   post-traumatic stress disorder was mentioned only during the mother's
   testimony, the court instructed the jury that the diagnosis had nothing
   to do with the evidence, and that the jury should ignore and not make
   any decision on the basis of that testimony, and the defendant offered
   no reason why that instruction was insufficient to break the link between
   the diagnosis and the charges against the defendant, and to prevent the
   jury from considering the isolated statement of the victim's mother
   during its deliberations; moreover, notwithstanding the defendant's
   assertion that the testimony constituted an improper endorsement of
   both his guilt and the victim's credibility, the jury's requests during
   deliberations to hear certain statements and to rehear portions of the
   victim's testimony suggested that although the question of the victim's
   credibility was a difficult one, the jury's finding that the defendant was
   not guilty of sexual assault with respect to any of the alleged incidents
   and was not guilty of an additional count of risk of injury to a child as
   charged indicated that the jury did not find all of the victim's testimony
   to be credible.

2. The trial court properly denied the defendant's motion to suppress the
   statements that he made to the police officers during their custodial
   interrogation of him, as he did not clearly and unequivocally invoke
   his right to counsel and, thus, the officers were not required to cease
   questioning him:

   a. Invocation of one's right to counsel requires, at a minimum, some state-

ment that reasonably can be construed as an expression of a desire for the assistance of counsel, and this court concluded that a reasonable police officer under the circumstances here would not have understood as a clear and unequivocal request for counsel the defendant's statements, "See, if my lawyer was here, I'd . . . we could talk. That's, you know, that's it," and, "I'm supposed to have my lawyer here. You know that"; although the defendant expressed to the officers misgivings about his attorney's advice, he continued talking with them, and the defendant's references to counsel might have been an attempt to persuade the officers to limit the interview's scope, a reiteration of his attorney's advice not to speak about the incidents at issue without counsel present, a request for an attorney or an expression that it was prudent to have an attorney present, rather than a request by the defendant that he actually wanted to speak to an attorney before proceeding with the interview.

b. Contrary to the defendant's unpreserved claim that article first, § 8, of the state constitution provided greater protection than does the federal constitution by requiring that the police officers cease questioning him to clarify any ambiguous or equivocal references to counsel that he made during the custodial interrogation, a review of this state's constitutional language, precedents and history did not disclose any meaningful difference between the state and federal constitutional protections against compulsory self-incrimination, courts in the majority of other states have concluded that their state constitutions do not afford greater protections in this context than does the federal constitution, the reasoning of other states' courts that have found greater protections in their state constitutions was unpersuasive, and the defendant's policy arguments were insufficient to justify any divergence from this state's Supreme Court precedent that the self-incrimination and due process clauses of article first, § 8, are coextensive with their federal counterparts and, therefore, this court declined to adopt a new state constitutional standard with respect to ambiguous or equivocal references to counsel.

Argued April 5—officially released July 4, 2017

(Appeal from Superior Court, judicial district of New Haven, O'Keefe, J.)

*Procedural History*

Substitute information charging the defendant with four counts of the crime of risk of injury to a child, two counts of the crime of sexual assault in the second degree and with the crime of sexual assault in the first degree, brought to the Superior Court in the judicial district of New Haven, where the court, *O'Keefe, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the matter was tried to the jury; subsequently, the court denied the defendant's motion for a mistrial; verdict and judgment of guilty of three counts of risk of injury to a child, from which the defendant appealed to this court. *Affirmed*.

*Richard Emanuel*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Seth R. Garbarsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Robert John Purcell, appeals from the judgment of the trial court, rendered after a jury trial, of conviction of one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and of two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[1] The jury found the defendant not guilty of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), two counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), and one count of risk of injury to a child in violation of § 53-21 (a) (2). On appeal, the defendant raises various claims pertaining to testimony by the victim's mother[2] that the victim had been diagnosed with post-traumatic stress disorder (PTSD testimony) and the trial court's denial of his motion to suppress statements that he made to the police during a custodial interrogation. With respect to the PTSD testimony, the defendant claims that allowing the victim's mother to testimony about his medical conditions constituted a harmful evidentiary error, which was based on the PTSD testimony. With respect to his motion to suppress, the defendant claims that the interrogating detectives violated *Edwards* v. *Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), by continuing to question him after he clearly and unambiguously invoked his right to counsel. Alternatively, the defendant argues that, even if his invocations were ambiguous or equivocal, and therefore ineffective under *Edwards*, article first, § 8, of the Connecticut constitution required the interrogating detectives to clarify his statements before questioning him further. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In 2002, the victim's parents adopted the victim, who had several medical conditions, including autism.[3] The defendant is the victim's uncle by marriage. The victim and his family had only a casual relationship with the defendant, whom they saw on average three to five times a year for holidays and family events. The victim initially viewed the defendant as "just an ordinary uncle," but, in 2010, when the victim was twelve and the defendant was seventy, the defendant began engaging in sexually inappropriate behavior with the victim.

Three incidents in particular served as the basis for the defendant's conviction. In August, 2010, the victim, the defendant, and other family members went to lunch at a restaurant. After lunch, the defendant and the victim went to use the bathroom. While in the bathroom, the defendant began rubbing his penis and asked the victim to rub it. The victim refused, left the bathroom, and returned to the table where his family was sitting. In

December, 2011, the victim and his father went to the defendant's house to visit his grandparents, who lived with the defendant and his wife. While the defendant and the victim's father spoke to the victim's grandfather in the basement apartment, the victim went upstairs to find the defendant's cats. The victim found one of the cats in the defendant's bedroom and began playing with it on the defendant's bed. Sometime thereafter, the defendant came into the bedroom and had contact with the victim's penis in a sexual and indecent manner. Finally, in August, 2013, the defendant and other members of the victim's family went to the victim's middle school to watch him perform in a school play. After the play, the defendant went to use the school bathroom, and the victim followed him inside so that he could remove his makeup. While in the bathroom, the defendant had contact with the victim's penis in a sexual and indecent manner.

In September, 2013, the victim's mother found pictures on the victim's Nintendo DS game console that concerned her, including pictures of the clothed stomachs of the defendant and the victim's father and two pictures of circumcised penises.[4] The victim's mother deleted the penis pictures. Later, she told the victim's father about the pictures she found and asked him to talk to the victim about them. Two weeks later, on Saturday, September 28, 2013, the victim's father engaged in a discussion with the victim about his sexuality.[5] The victim's father asked if the victim liked girls or boys, to which the victim replied that he liked girls. The victim's father explained that, in the eyes of the Catholic Church, it is bad and a sin to like boys and that sex should occur between a man and a woman. The victim then acknowledged that he had started to like and think about boys but maintained, "[i]t's not my fault." The victim told his father that the defendant "has been having sex with me."

The following Monday, September 30, 2013, after the victim left for school, the victim's parents went to the police station to report his allegation. While at the police station, the victim's parents received a phone call from the victim's school social worker informing them that the victim told him that his "Uncle Robert" was having sex with him.

The defendant was subsequently arrested on the basis of the victim's allegations. The operative long form information charged the defendant with seven offenses in connection with four separate incidents. Relative to the August, 2010 incident, the defendant was charged with risk of injury to a child in violation of § 53-21 (a) (1). Relative to the December, 2011 incident, the defendant was charged with sexual assault in the first degree in violation of § 53a-70 (a) (1) and risk of injury to a child in violation of § 53-21 (a) (2). Relative to an incident that allegedly occurred in April, 2012, the

defendant was charged with sexual assault in the second degree in violation of § 53a-71 (a) (1) and risk of injury to a child in violation of § 53-21 (a) (2). Finally, relative to the August, 2013 incident, the defendant was charged with sexual assault in the second degree in violation of § 53a-71 (a) (1) and risk of injury to a child in violation of § 53-21 (a) (2).

After a trial, a jury found the defendant guilty of the risk of injury counts with respect to the August, 2011, the December, 2011, and the August, 2013 incidents. The jury found the defendant not guilty of all counts of sexual assault and not guilty of the risk of injury count relative to the alleged incident in April, 2012. The defendant was sentenced to a total effective term of sixteen years of imprisonment, execution suspended after nine years, and ten years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

We begin with the defendant's claims pertaining to the PTSD testimony. The defendant claims that the PTSD testimony was hearsay and constituted a harmful nonconstitutional evidentiary error, and, therefore, the court abused its discretion by denying his motion for a mistrial. In particular, the defendant argues that the PTSD testimony "constituted an [improper] endorsement or confirmation of [the victim's] credibility—and the defendant's guilt," and improperly embraced an ultimate issue in the case, i.e., whether some or all of the events the victim described actually happened, thereby causing his PTSD. The defendant argues that the prejudicial nature of this evidence was beyond the curative powers of the court because the PTSD diagnosis related to the victim's credibility, which was crucial to a successful prosecution because the state's case lacked physical evidence of sexual assault and portions of the victim's testimony "were highly implausible." The state responds that the court's "clear and forceful curative instructions . . . expressly broke any link between the PTSD diagnosis and the charges for which the defendant was on trial . . . and expressly removed [the PTSD] testimony . . . from evidence entirely." As a result, the state argues, the PTSD testimony did not constitute a harmful evidentiary error and the court did not abuse its discretion by denying the defendant's motion for a mistrial. We agree with the state.

The following additional facts are relevant to these claims. The victim's mother was the first witness as the trial commenced. She began her testimony by providing background on the victim and his medical conditions, including his autism. During a colloquy with the prosecutor about other medical conditions that the victim had been diagnosed with, defense counsel objected on the ground of hearsay. The court overruled the objection but admonished the victim's mother to limit her testimony to her understanding of her son's medical

conditions and not to testify about what someone else told her. After further discussion about the victim's medical conditions, the following colloquy occurred:

"[The Prosecutor]: I think we're missing one or two other conditions, if the—if the court pleases.

"The Court: Okay. That's the question then. What other conditions?

"[The Prosecutor]: Fair enough.

"The Court: Yeah. Go ahead.

"[The Victim's Mother]: Okay. *He also suffers from post-traumatic stress disorder, which was a later diagnosis after why we're here.* I'm trying to think what else was on there. I think that's—

"[The Prosecutor]: Well, let me ask you this.

"[The Victim's Mother]: Yeah. Okay.

"[The Prosecutor]: Does he take any meds currently?

"[The Victim's Mother]: Yes, he does.

"[The Prosecutor]: Okay. And what type of meds does he take?

"[The Victim's Mother]: I'm sorry. He takes Concerta for [attention deficit hyperactivity disorder]. He—

"[The Prosecutor]: Is that one of the—

"The Court: The jury can be excused for a minute." (Emphasis added.)

Thereafter, the jury exited the courtroom, and the court excused the victim's mother from the witness stand. The court then engaged in a lengthy discussion with counsel about how to address the PTSD testimony. The court observed: "PTSD is somebody else's opinion that—that a person has suffered a stressful event and is reacting to it. So, it's almost a comment on circumstantial evidence of the credibility of the [victim]." Defense counsel explained that he had never seen any evidence that the victim had been diagnosed with PTSD and opined: "I don't know how we cure that at this point." Although the prosecutor acknowledged that he was aware of the PTSD diagnosis prior to the PTSD testimony, he maintained that he did not know that the mother would testify about it.[6] The prosecutor further disputed the court's suggestion that the PTSD testimony constituted circumstantial evidence of the credibility of the victim because it was his understanding that the victim was prescribed medication for PTSD based on his symptoms, not based on a discussion with someone about a traumatic event. The court explained: "As soon as I heard that, I interpreted it—that, as someone treated the [victim]. She said it was related to this event. They determined that it was a valid event and diagnosed him with a reaction to this event. That's my—my interpretation of when a person says, he's treated for PTSD

as a result of this event."

After discussing the import of the statement by the victim's mother with the prosecutor further, the court asked defense counsel for his opinion. Defense counsel stated: "Your Honor, again, I was not prepared for that. I don't think it can be cured. I move for a mistrial at this point, Your Honor. I think it's an—she says that an expert has diagnosed him with this condition and it relates to the reason that we're here." The court and the parties continued to discuss how best to address the PTSD testimony. After a brief recess, the court issued the following ruling: "Well, I don't think that there's enough for a mistrial at this point. I'll give defense counsel the option. I'll give the strongest instruction possible on this issue of PTSD, and point out to [the jury], as the prosecutor has said, that there's really nothing in the record which would indicate that the—whatever that's about is related to this event. Now, PTSD may—may come up later in the trial, but everything is context. At this point, it's—you know, link it— I would think that the jury would link that to this event, and it's somebody else's opinion about— really, about the credibility of the complainant, or I'll ignore it, if that's what you want." Defense counsel stated, "I feel like I'm in a catch-22," because he did not want to highlight the testimony, but he decided that it would be "prudent that a curative instruction be administered."

When the jury returned to the courtroom, the court gave the following instruction: "The witness will be back in a minute, but before she comes back, let me talk about—she said that there was—the PTSD—there was a PTSD diagnosis. *That has nothing to do with the evidence in this—in this case. There's nothing in the record that links the PTSD to this case. Ignore it. Don't make any decision in this case, none, based on what she said about PTSD. Just completely and totally ignore it, like it isn't even part of the record, like it isn't even part of the evidence.* Okay. All right. She can come back." (Emphasis added.)

We begin our analysis by setting forth the legal principles that govern the defendant's claims. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as [1] the importance of the . . . testimony in the [state's] case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony . . . on material points, [4] the extent of cross-

examination otherwise permitted, and, of course, [5] the overall strength of the [state's] case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014); see also *State* v. *Bouknight*, 323 Conn. 620, 626, 149 A.3d 975 (2016) ("[t]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error" [internal quotation marks omitted]).

"In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Berrios*, 320 Conn. 265, 274, 129 A.3d 696 (2016). On appeal, we are cognizant of the fact that "[t]he trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Citation omitted; internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 555, 122 A.3d 555 (2015).

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided." (Internal quotation marks omitted.) Id., 554–55. "[I]n the absence of evidence that the jury disregarded any of the court's instructions, we presume that the jury followed the instructions." *State* v. *A. M.*, 324 Conn. 190, 215, 152 A.3d 49 (2016). Mere conjecture by the defendant is insufficient to rebut this presumption. *State* v. *Gaffney*, 209 Conn. 416, 422, 551 A.2d 414 (1988); *State* v. *Reddick*, 33 Conn. App. 311, 336 n.13, 635 A.2d 848 (1993), cert. denied, 228 Conn. 924, 638 A.2d 38 (1994). "The burden is on the defendant to establish that, in the context of the proceedings as a whole, the challenged testimony was so prejudicial, notwithstanding the court's curative instructions, that the jury reasonably cannot be presumed to have disregarded it." *State* v. *Nash*, 278 Conn. 620, 659–60, 899 A.2d 1 (2006).

Having scrupulously reviewed the record in this case, we are not persuaded that the jury's verdict was substantially swayed by the PTSD testimony or that the

court abused its discretion by denying the defendant's motion for a mistrial. The only time the victim's PTSD diagnosis was mentioned was during the testimony of the victim's mother. After that testimony, the court instructed the jury that the victim's PTSD diagnosis "has nothing to do with the evidence . . . in this case" and that "[t]here's nothing in the record that links the PTSD to this case." In addition, the court admonished the jury that it was not to "make any decision in this case, none, based on what [the victim's mother] said about PTSD" and that they were to "completely and totally ignore it, like it isn't even part of the record, like it isn't even part of the evidence." The defendant has offered no persuasive reason why this prompt, clear, and forceful instruction by the court was insufficient to break the link between the PTSD diagnosis and the charges for which the defendant was on trial and to prevent the jurors from considering this isolated statement by the victim's mother during their deliberations.

We recognize that the state's case was not particularly strong, given the lack of physical or eyewitness evidence, and that, as a result, the victim's testimony was crucial to a successful prosecution. See *State* v. *Maguire*, 310 Conn. 535, 561, 78 A.3d 828 (2013) (sexual assault case not strong where "there was no physical evidence of abuse, and there was no eyewitness testimony other than that of the victim, whose testimony at times was both equivocal and vague"); *State* v. *Ritrovato*, 280 Conn. 36, 57, 905 A.2d 1079 (2006) ("[a]lthough the absence of conclusive physical evidence of sexual abuse does not automatically render the state's case weak where the case involves a credibility contest between the victim and the defendant . . . a sexual assault case lacking physical evidence is not particularly strong, especially when the victim is a minor" [citation omitted]). During its deliberations, the jury sent notes to the court requesting to hear the victim's police interview, which was not in evidence, and to rehear portions of the victim's testimony, which suggested that the question of the victim's credibility was a difficult one. See *State* v. *Devalda*, 306 Conn. 494, 510, 50 A.3d 882 (2012) ("[w]e have recognized that a request by a jury may be a significant indicator of their concern about evidence and issues important to their resolution of the case" [internal quotation marks omitted]). In addition, the jury's finding that the defendant was not guilty of sexual assault with respect to any of the alleged incidents and not guilty of one of the counts of risk of injury indicates that the jury did not in fact find all aspects of the victim's testimony to be credible. See *State* v. *Samuel M.*, 159 Conn. App. 242, 255, 123 A.3d 44 (2015) (jury's finding of guilty of three counts of sexual assault in the first degree and one count of risk of injury and finding of not guilty of nine other counts of sexual assault in the first degree "demonstrates that [the jury] did reject a vast portion of [the

victim's] testimony"), aff'd, 323 Conn. 785, 151 A.3d 815 (2016).

Nevertheless, a jury may properly decide "what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Victor C.*, 145 Conn. App. 54, 61, 75 A.3d 48, cert. denied, 310 Conn. 933, 78 A.3d 859 (2013). The defendant has not persuaded us that the jury failed to heed the court's curative instruction and that its deliberations, therefore, were improperly influenced by the PTSD testimony.

## II

We next address the defendant's claim that his rights under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution were violated when the court denied his motion to suppress statements that he made to the police during a custodial interrogation. The defendant argues that his statements (1) "See, if my lawyer was here, I'd, then I'd, we could talk. That's, you know, that's it," and, (2) "I'm supposed to have my lawyer here. You know that," constituted clear and unequivocal invocations of his right to counsel, requiring the detectives to cease all questioning until counsel was present. Alternatively, the defendant argues that even if the disputed statements were ambiguous or equivocal, article first, § 8, required the detectives to cease questioning immediately and to clarify his statements.[7] We disagree with both contentions.

The following additional facts are relevant to this claim. On October 17, 2013, Detective Michael Zerella and Sergeant John Ventura interviewed the defendant concerning the victim's allegations (first interview). The defendant agreed to come to the police station to discuss a complaint made against him, but he was not made aware of the nature of the allegations prior to arriving. When it became apparent that he was being accused of engaging in sexually inappropriate conduct with the victim, the defendant explained two instances that he could think of that served as the basis for the victim's complaint, but he maintained that nothing inappropriate happened. Approximately twenty minutes into the interview, Zerella wondered aloud whether, based on what he knew happened, "(a) you're a sick, perverted person or, or stuff, stuff accidentally happened." The following exchange occurred:

"[The Defendant]: Let's, let's, let's stop this here.

"[Zerella]: Or stuff, stuff happened.

"[The Defendant]: It sounds, sounds, sounds, like I need a lawyer, right?

"[Ventura]: It's up to you.

"[The Defendant]: I know it.

"[Ventura]: Why would you say that, though? That

you need a lawyer?

"[The Defendant]: Well, it sound, sounds like, well, you, uh. . .

"[Ventura]: You could get up and leave any time you want.

"[The Defendant]: That I could be, possibly be, a sick, perverted person.

"[Zerella]: You didn't, you didn't let me, you didn't let me finish what I was gonna say.

"[The Defendant]: But it sounds, sounds like you said it, I'm a, sounds like I might, might be a sick, perverted person.

"[Zerella]: Or something innocently happened that, that, that didn't, that didn't mean to happen. That's all. I, we need to know that. That's why I need to know from you the truth. That's, that's what I'm trying to get at here."

The interview continued. Approximately thirty minutes into the interview, however, when Zerella and Ventura began to press the defendant about why the victim would make up these allegations and give "specific incidents that Uncle Bobby and me had sex together," the defendant ended the interview because "[t]hings are getting strange now. . . . It's a little bit too strange." The defendant was permitted to leave the police station.

On November 26, 2013, the defendant was arrested and charged with sexual assault in the first degree and risk of injury to a child. That same day, Zerella and Detective Sean Fairbrother interviewed the defendant (second interview). Zerella began the interview by reading the defendant his *Miranda*[8] rights and asking him to complete a *Miranda* waiver form. The defendant asked: "I can still, after, after, after I initial that, I can still stop answering then?" Zerella replied: "Oh, anytime you want. No problem."

After the defendant completed the *Miranda* waiver form, Zerella asked the defendant whether he knew why he had been arrested. The defendant explained that he had received a letter from the Department of Children and Families (department) informing him that he was being investigated for allegations of child abuse with respect to the victim. When Zerella asked what he discussed with the department, the defendant stated that he had never talked to anyone from the department. Zerella asked why, and the defendant explained: "Well, I asked my lawyer, and he said, well, just not to, I, I think that's, I think that's all together wrong, but that's what he said." He went on to elaborate that "my lawyer knows what's going on, you know? But, he says don't talk, I don't talk." When Zerella asked him how he felt about that, the defendant stated: "Well, it's like I said, I probably wouldn't be here now if I talked to them."

Zerella suggested that if he had elaborated more and been more forthcoming during the first interview, they might not be here. After some discussion about whether and why Zerella called him a pervert during the first interview, Zerella stated: "Okay, well, we could, we could go on about the last interview if you want to, but—" The defendant interjected: "—I know, I know . . . let's . . . let's go on right, what, what more do you want to know?"

After remarking that the defendant knew he was under arrest and that a judge and prosecutor had found probable cause to arrest him, the defendant observed that it was because "I didn't talk, that's why." Zerella remarked: "Well, you did, you did talk to me. You did tell me a few things." The defendant agreed but acknowledged, "not enough, I know." The defendant then expressed his belief that the victim's parents were acting wrongly by pressing charges against him and his concern that nobody would believe him over the victim's parents because they are both retired members of the police department. Zerella explained that it was the victim, not his parents, who was pressing charges and that he had already corroborated many of the victim's allegations. When Zerella asked the defendant to tell him some of the stories of his encounters with the victim, the defendant opined: "I don't know the stories that he made up."

Fairbrother asked the defendant whether he knew the crime with which he was charged, and the defendant replied child abuse. Fairbrother explained that he was charged with sexual assault and risk of injury to a child. The defendant asked whether that means that the allegation is that he did something sexual with the victim, and Fairbrother said that it did. The defendant adamantly denied having sexual relations with the victim. When the detectives pressed him about whether there were any moments that could be misconstrued as inappropriate, the defendant responded: "Well, yes, there's what, well, I, I, my lawyer said not to talk about it but, no, it's." The detectives both stated that it was up to the defendant whether to talk with them.

The defendant observed that Zerella had told him that there was a picture of him naked on the victim's Nintendo DS during the first interview, and he asked repeatedly whether the picture actually existed.[9] When Zerella suggested that the defendant had personal knowledge that the picture existed, the defendant insisted that he did not and that he knew about the picture only because Zerella told him about it during the first interview. Zerella maintained that "there's other, other things, there's other instances beside that," and, after the defendant asked what, Zerella observed that "you just said, there [is] stuff but my lawyer told me not to talk about it." The defendant stated that he was referring to the picture. He further asked, "what else

is there," and opined that he wanted to know "what they are pressing against me." Thereafter, the following exchange occurred:

"[Zerella]: Alls I got to say is, tomorrow, when you go in to court, you're gonna look at a judge and a prosecutor. . . . And they're gonna look at all this stuff, all these allegations that were made against you. . . . That it's a, it's a very, very strong case against you. Very, very strong. They're gonna look at it and say, listen, this, this man, because they don't know you from Adam, but they're just gonna see you.

"[The Defendant]: Right. Well, they're gonna know my name.

"[Zerella]: As, as a, as a, as a mean, as a mean individual.

"[The Defendant]: Right.

"[Zerella]: In, in reality—

"[Fairbrother]: As a predator.

"[Zerella]: As a predator, who, who's technically not cooperating and not saying, yeah, this is, this is what happened, this is probably why he thinks, thinks the way he does or—

"[The Defendant]: —*See, if my lawyer was here, I'd, then I'd, we could talk. That's, you know, that's it.*

"[Zerella]: It's up to you. You could—

"[The Defendant]: —I know it. I know, I know, I know it.

"[Zerella]: You could (a), you could (a) talk to me or you could (b) not talk to me.

"[The Defendant]: I know it but, I'm trying, you know I, *I'm supposed to have my lawyer here. You know that.*

"[Zerella]: You don't, you don't have to, it's, it's—

"[Fairbrother]: It's up to you.

"[Zerella]: It's up to you, man. Some people talk to me without one, some people want one it . . . it's all up to you, man. . . I'm just affording you that opportunity, that's all.

"[Fairbrother]: The problem is that, at your age, you don't want to go to prison.

"[The Defendant]: [indiscernible]

"[Fairbrother]: Okay? You don't want to go to prison. If there was some inappropriate things with this child, something that can be explained, maybe you helped him go to the bathroom, maybe, you know, he makes some sort of crazy allegation or does some sort of craziness, he's not—

"[Zerella]: —Maybe he—

"[Fairbrother]: He doesn't have a hundred percent

capacity. If you're in a, now, now is the time to talk about it, now is to get your half out there.

"[Zerella]: Yeah, maybe he came at you.

"[Fairbrother]: —You know if—

"[Zerella]: Maybe he came at you.

"[Fairbrother]: You know, that, that's all we're offering you, the opportunity to, because it's the last time we're gonna be able to talk.

"[Zerella]: That's all.

"[Fairbrother]: You know, that's all, and, and, you know, if—

"[The Defendant]: —Oh, geez, I don't know—

"[Fairbrother]: —If you want to have an attorney—

"[The Defendant]: —I, I don't think it's—

"[Fairbrother]: —That's fine. You can, but—

"[The Defendant]: —that's right, right or wrong, but, uh, real, really.

"[Zerella]: Just, just affording you the opportunity, sir, because after, after today, you're never gonna be able to, to give me or any other cop your story. You're gonna let, a judge is gonna look at ya and say, some serious charges against you. You could go to jail for the rest of your life.

"[The Defendant]: All right, now what's, what, what, what, uh, all right, I'll, I'll, I'll talk. Uh, what do you, what do you, what do you want to know? Tell, tell me, what do you want to know." (Emphasis added.)

Thereafter, the interview continued without further mention of counsel.

On June 4, 2014, the defendant filed a generic motion to suppress any oral or written statements that he gave to the police pursuant to the fifth, sixth, and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. On April 28, 2015, the defendant filed a second motion to suppress the statements that he made during the second interview, pursuant to the fifth and fourteenth amendments and article first, § 8, on the grounds that his statement "was taken against his rights to counsel, to remain silent, and self-incrimination."[10] The court was provided with a video recording and transcript of the second interview. A suppression hearing was held during trial on April 29, 2015, during which the court heard the brief testimony of Zerella and argument from counsel. At the end of the hearing, the court issued an oral ruling denying the defendant's motion to suppress.[11]

A

We begin by setting forth the legal principles that guide our analysis of the defendant's claim that the

detectives violated *Edwards* by continuing to question him after he clearly and unequivocally invoked his right to counsel during the second interview.[12] In *Miranda* v. *Arizona*, 384 U.S. 436, 469–73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. . . . If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." (Citations omitted.) *Davis* v. *United States*, 512 U.S. 452, 457–58, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

In *Edwards* v. *Arizona*, supra, 451 U.S. 484–85, however, the United States Supreme Court determined that the "traditional standard for waiver was not sufficient to protect a suspect's right to have counsel present at a subsequent interrogation if he had previously requested counsel . . . ." *Maryland* v. *Shatzer*, 559 U.S. 98, 104, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010). The court therefore superimposed a " 'second layer of prophylaxis' " to prevent the police from badgering a defendant into waiving his previously asserted *Miranda* rights. Id.; *Davis* v. *United States*, supra, 512 U.S. 458. Under the *Edwards* rule, if a suspect requests counsel at any time during the interview, he cannot be subjected to further questioning until an attorney has been made available, unless the suspect himself reinitiates conversation or a fourteen day break in custody has occurred. See *Maryland* v. *Shatzer*, supra, 110; *Edwards* v. *Arizona*, supra, 484–85.

"The applicability of the rigid prophylactic rule of *Edwards* requires courts to determine whether the accused *actually invoked* his right to counsel. . . . To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. . . . Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. . . . But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. . . .

"Rather, the suspect must unambiguously request counsel. As we have observed, a statement either is such an assertion of the right to counsel or it is not. . . . Although a suspect need not speak with the discrimination of an Oxford don . . . he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an

attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Davis* v. *United States*, supra, 512 U.S. 458–59.

In the present case, we conclude that a reasonable police officer in this circumstance would not have understood the disputed statements—"See, if my lawyer was here, I'd, then I'd, we could talk. That's, you know, that's it," and, "I'm supposed to have my lawyer here. You know that"—to be requests for an attorney. At the outset of the interview, the defendant was informed of his *Miranda* rights and waived them in writing. Shortly thereafter, the defendant told the detectives that he had consulted an attorney after he received a notice from the department concerning its investigation into the victim's allegations and that the attorney advised him "not to talk about it." The defendant repeatedly expressed his misgivings with that advice and his belief that he would not have been arrested had he spoken with the department concerning the victim's allegations. Moreover, after referencing his attorney's advice "not to talk about it," the defendant continued to talk to the detectives about the victim's allegations. Indeed, on one occasion, he opined that his attorney did not want him to talk about any moments that could be misconstrued as inappropriate, e.g., the picture purportedly on the victim's Nintendo DS, and then he proceeded to ask about the picture Zerella mentioned during the first interview. Finally, in the moments leading up to the disputed statements, it was evident that the defendant wanted both to avoid discussing his side of the story and to obtain more information about the victim's allegations and the evidence against him.

In light of these preceding circumstances, the defendant's first reference to counsel—"See, if my lawyer was here, I'd, then I'd, we could talk. That's, you know, that's it"—"lacked the clear implication of a present desire to consult with counsel . . . ." *Lord* v. *Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994). This statement might well have been an attempt to persuade the detectives to limit the scope of the interview to the victim's allegations and the detectives' evidence, a reiteration of his attorney's advice that he should not discuss his side of the story without counsel present, a request for an attorney, or something else entirely. Because of this ambiguity in the statement, it cannot be considered an effective invocation of the right to counsel under *Edwards*. The defendant argues that his next reference to counsel—"I'm supposed to have my lawyer here. You know that"—clarified any ambiguity. We disagree. This statement could also mean that the defendant simply believed that it was prudent for him to have an attorney present when speaking to authorities, not that he actually wanted to speak to an attorney before proceeding further with the interview.

Accordingly, we conclude that the court properly denied the defendant's motion to suppress because he did not clearly and unequivocally invoke his right to counsel and, therefore, the detectives were not required to cease questioning him.

### B

Alternatively, the defendant argues that even if his invocation of the right to counsel was ambiguous or equivocal, the self-incrimination and due process clauses of article first, § 8, of our state constitution required the detectives to cease questioning immediately and to clarify his ambiguous references to counsel. The defendant seeks review of this unpreserved state constitutional claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[13] Although we conclude that the defendant's claim is reviewable pursuant to the first and second prongs of *Golding*, the defendant is not entitled to reversal under the third prong of *Golding* because our state constitution does not provide greater protection than the federal constitution in this context. As a matter of state constitutional law, interrogating officers are not required to clarify ambiguous or equivocal references to an attorney. This conclusion does not diminish, however, our admonition to law enforcement that it is the better practice to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Saturno*, 322 Conn. 80, 102, 139 A.3d 629 (2016). In determining the contours of the protections provided by our state constitution, we employ a multifactor approach that our Supreme Court first adopted in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). The factors that we consider are (1) the text of the relevant constitutional provisions; (2) persuasive federal precedents; (3) related Connecticut precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of the constitutional framers; and (6) relevant public policies. *State* v. *Santiago*, 318 Conn. 1, 17–18, 122 A.3d 1 (2015). We address each factor in turn.

### 1

The first factor, the text of the relevant constitutional provisions, favors the state. Although the wording of the state and federal self-incrimination clauses is different,[14] our Supreme Court has repeatedly "declined to construe this provision more broadly than the right provided in the fifth amendment to the United States

constitution." *State* v. *Lockhart*, supra, 298 Conn. 552; *State* v. *Castonguay*, 218 Conn. 486, 495–96, 590 A.2d 901 (1991); *State* v. *Asherman*, 193 Conn. 695, 711–15, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). "The due process clauses of the state and federal constitutions are virtually identical."[15] *State* v. *Ledbetter*, 275 Conn. 534, 562, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). As a result, our Supreme Court has previously recognized that the similarity between the two provisions "support[s] a common source and, thus, a common interpretation of the provisions." (Footnote omitted.) Id.; see also *State* v. *Wade*, 297 Conn. 262, 288, 998 A.2d 1114 (2010).

2

The second *Geisler* factor, persuasive federal precedents, favors the state as well. In *Davis* v. *United States*, supra, 512 U.S. 459, the United States Supreme Court "decline[d] [the] petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." Instead, the *Davis* court adopted a bright-line approach: "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id., 461–62.

Moreover, the United States Supreme Court has "frequently emphasized that the *Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis. . . . Because *Edwards* is our rule, not a constitutional command, it is our obligation to justify its expansion. . . . A judicially crafted rule is justified only by reference to its prophylactic purpose . . . and applies only where its benefits outweigh its costs . . . ." (Citations omitted; internal quotation marks omitted.) *Maryland* v. *Shatzer*, supra, 559 U.S. 105–106; id., 108–109 (declining to extend *Edwards* to prevent officers from approaching suspects who have invoked their right to counsel after there has been break in custody because of diminished benefits and increased costs, namely, "voluntary confessions it excludes from trial, and the voluntary confessions it deters law enforcement officers from even trying to obtain").

3

The third *Geisler* factor, related Connecticut precedents, favors the state. The defendant is correct that this state has a long history of commitment to the principles of *Miranda*, as evidenced by the fact that our Supreme Court recognized the constitutional significance of *Miranda* long before the United States Supreme Court. Compare *State* v. *Ferrell*, 191 Conn. 37, 40–41, 463 A.2d 573 (1983) ("[a]lthough the *Miranda* warnings were originally effective in state prosecutions only because they were a component of due process

of law under the fourteenth amendment . . . they have also come to have independent significance under our state constitution" [citations omitted]), with *Dickerson* v. *United States*, 530 U.S. 428, 432, 444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (holding *Miranda* is a constitutional rule). Nevertheless, our Supreme Court has consistently held that our self-incrimination and due process clauses do not afford greater protection than the federal due process and self-incrimination clauses. See part III B 1 of this opinion. As a result, our courts have previously declined to utilize our state constitution to afford suspects greater protections during custodial interrogations than the federal constitution affords. E.g., *State* v. *Lockhart*, supra, 298 Conn. 543–44 (declining to require all custodial interrogations to be recorded); *State* v. *Lawrence*, 282 Conn. 141, 158–59, 920 A.2d 236 (2007) (declining to require higher standard of proof to establish voluntariness of confession); *State* v. *Piorkowski*, 243 Conn. 205, 221, 700 A.2d 1146 (1997) (declining to require presence of counsel for valid waiver of right to counsel when defendant initiates contact with police and has been properly advised of his *Miranda* rights); *State* v. *Doyle*, 104 Conn. App. 4, 15–16 n.4, 931 A.2d 393 (declining to extend warnings required by *Miranda* to noncustodial police interviews), cert. denied, 284 Conn. 935, 935 A.2d 152 (2007). Indeed, our Supreme Court has declined to deviate from federal precedent specifically in the context of a defendant's invocation of the right to counsel under *Miranda*. E.g., *State* v. *Barrett*, 205 Conn. 437, 447, 448, 534 A.2d 219 (1987) (state constitution, like federal constitution, permits a distinction between suspect's willingness to make uncounseled oral statements and his disinclination to make uncounseled written statements); *State* v. *Hafford*, 252 Conn. 274, 293–94, 746 A.2d 150 (declining to hold that, as a matter of state constitutional law, when officers have honored an equivocal request for counsel by not asking suspect any further questions and suspect subsequently initiates contact with police, they cannot resume interrogation without first clarifying earlier equivocal request for counsel), cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

Nonetheless, the defendant argues that the rule he proposes finds support in other aspects of our Supreme Court's jurisprudence. The precedent relied on by the defendant, however, is unpersuasive. First, the defendant relies on *State* v. *Ferrell*, supra, 191 Conn. 37, to support his contention that article first, § 8, affords greater protection than the federal constitution in the context of the right to counsel under *Miranda*. In *Ferrell*, our Supreme Court held that police officers may not testify regarding statements they overheard while the defendant, who was in custody, was speaking with his attorney; id., 41–42; reasoning that "the right to consult a lawyer before being interrogated is meaningless if the accused cannot privately and freely discuss

the case with that attorney." Id., 45. The court's holding, however, was based on the due process clauses of both the state and federal constitutions, which it treated as being coextensive with one another. Id., 41, 45; see also *State* v. *Lockhart*, supra, 298 Conn. 554 (*Ferrell* does not "[indicate] that our state constitution imposes greater protections with regard to the advisement of *Miranda* rights or requires additional corroboration for admission of testimony describing such an advisement").

The defendant also relies on *State* v. *Stoddard*, 206 Conn. 157, 161, 537 A.2d 446 (1988). In that case, our Supreme Court concluded that our state constitution, unlike the federal constitution, imposes a duty on officers who are holding a suspect for custodial interrogation to act reasonably, diligently, and promptly to apprise the suspect of efforts by counsel to provide pertinent and timely legal assistance. Id., 163; cf. *Moran* v. *Burbine*, 475 U.S. 412, 422–23, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (declining to impose such a duty). The court further held that a waiver of *Miranda* rights may, depending upon the totality of the circumstances, be vitiated by the failure of the police to fulfill this duty. *State* v. *Stoddard*, supra, 163. The court reasoned that the fact that "a suspect validly waives the presence of counsel only means for the moment the suspect is foregoing the exercise of that conceptual privilege. . . . Faced with a concrete offer of assistance, however, a suspect may well decide to reclaim his or her continuing right to legal assistance. To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. . . . We cannot therefore conclude that a decision to forego the abstract offer contained in *Miranda* embodies an implied rejection of a specific opportunity to confer with a known lawyer." (Citations omitted; internal quotation marks omitted.) Id., 168.

Importantly, the conclusion in *Stoddard* was influenced by Connecticut's "long history of recognizing the significance of the right to counsel . . . ." Id., 164; see also id., 164–66. The court acknowledged that "this history specifically illuminates the right to counsel that attaches after the initiation of adversary judicial proceedings," but it concluded that this history also informed the due process concerns raised by police interference with counsel's access to a custodial suspect. Id., 166. In particular, the court reasoned that because the police are responsible for the suspect's isolation during a custodial interrogation, they "may not preclude the suspect from exercising the choice to which he is constitutionally entitled by responding in less than forthright fashion to the efforts by counsel to contact the suspect." Id., 167.

Our Supreme Court clarified the narrow confines of *Stoddard* in *State* v. *Whitaker*, 215 Conn. 739, 751–52, 578 A.2d 1031 (1990). In that case, the defendant, who was a minor at the time of the custodial interrogation in question, argued that *Stoddard* required officers to inform him that his mother had called the police station and told them that she wanted him to speak with an attorney. Id., 751. The court rejected the defendant's claim, stating that "*Stoddard* prohibited only police interference in the attorney-client relationship." (Internal quotation marks omitted.) Id., 752. The court considered the advice of the defendant's mother to be "more akin to an abstract offer to call some unknown lawyer than the concrete offer of [legal] assistance that *Stoddard* protects." (Internal quotation marks omitted.) Id.

Like *Whitaker*, the present case does not directly implicate the attorney-client relationship or to involve a concrete offer of legal assistance. Instead, the defendant is asking this court to adopt a rule that would require interrogating officers to clarify equivocal or ambiguous references to an attorney in order to determine whether the defendant wants to invoke his right to counsel. *Stoddard* does not support the proposition that interrogating officers have a duty to help suspects calibrate their self-interest in deciding whether to speak or to invoke their *Miranda* rights. See *State* v. *Stoddard*, supra, 206 Conn. 168 ("the police have no general duty to 'supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights' "); see also *State* v. *Lockhart*, supra, 298 Conn. 554 (*Stoddard* does not "[indicate] that our state constitution imposes greater protections with regard to the advisement of *Miranda* rights or requires additional corroboration for admission of testimony describing such an advisement").

Finally, the defendant relies on pre-*Davis* precedent, in which our Supreme Court held that the federal constitution requires police officers upon the defendant's making of an ambiguous or equivocal reference to an attorney to cease questioning immediately and to clarify the statement. *State* v. *Anderson*, 209 Conn. 622, 627, 553 A.2d 589 (1989); *State* v. *Acquin*, 187 Conn. 647, 673–75, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983), overruled in part by *Davis* v. *United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); see also *State* v. *Anonymous*, 240 Conn. 708, 723 n.16, 694 A.2d 766 (1997). The defendant argues that because of this precedent, he "is not asking this court to 'go out on a limb' to make 'new law,' but is rather asking the court to embrace the 'old law'—and to refuse to follow *Davis*' step *backward* with respect to the *Miranda* right to counsel." (Emphasis in original.) The problem with the defendant's argument is that neither *Anderson* nor *Acquin* illuminate the issue presently before this

court—whether (and why) our state constitution affords greater protection than the federal constitution in this context—because neither case adopted the clarification approach because of *state specific* factors. Instead, our Supreme Court adopted the clarification approach because, at the time, the United States Supreme Court had not provided guidance on how to address ambiguous or equivocal references to counsel and the trend among federal courts was to require clarification. *State* v. *Anderson*, supra, 627–28; *State* v. *Acquin*, supra, 673–75.

4

The fourth *Geisler* factor, persuasive precedents of other state courts, favors the state. The majority of states to address the specific issue of whether their state constitutions require interrogating officers to clarify ambiguous invocations of the right to counsel have followed *Davis* and declined to require clarification.[16] E.g., *People* v. *Crittenden*, 9 Cal. 4th 83, 129, 885 P.2d 887, 36 Cal. Rptr. 2d 474 (1994), cert. denied, 516 U.S. 849, 116 S. Ct. 144, 133 L. Ed. 2d 90 (1995); *State* v. *Owen*, 696 So. 2d 715, 719 (Fla.), cert. denied, 522 U.S. 1002, 118 S. Ct. 574, 139 L. Ed. 2d 413 (1997); *Taylor* v. *State*, 689 N.E.2d 699, 704 (Ind. 1997); *State* v. *Morgan*, 559 N.W.2d 603, 609 (Iowa 1997); *State* v. *Morris*, 255 Kan. 964, 981, 880 P.2d 1244 (1994); *Franklin* v. *State*, 170 So. 3d 481, 491 (Miss. 2015); *State* v. *Nixon*, 369 Mont. 359, 368–69, 298 P.3d 408 (2013); *State* v. *Perry*, 146 N.M. 208, 217, 207 P.3d 1185 (App. 2009); *State* v. *Saylor*, 117 S.W.3d 239, 245–46 (Tenn. 2003), cert. denied, 540 U.S. 1208, 124 S. Ct. 1483, 158 L. Ed. 2d 133 (2004); *State* v. *Panetti*, 891 S.W.2d 281, 283–84 (Tex. 1994); *State* v. *Horton*, 195 Wn. App. 202, 216–17, 380 P.3d 608 (2016), review denied, 187 Wn. 2d 1003, 386 P.3d 1083 (2017); *State* v. *Farley*, 192 W. Va. 247, 256, 452 S.E.2d 50 (1994); *State* v. *Jennings*, 252 Wis. 2d 228, 249, 647 N.W.2d 142 (2002); see *Commonwealth* v. *Sicari*, 434 Mass. 732, 746 n.10, 752 N.E.2d 684 (2001) (Supreme Judicial Court of Massachusetts "content to interpret" applicable provision in state constitution as fifth amendment has been interpreted by United States Supreme Court), cert. denied, 534 U.S. 1142, 122 S. Ct. 1096, 151 L. Ed. 2d 993 (2002). In many of these cases, the court's decision was driven by the fact that the relevant state constitutional provisions were virtually identical to and had been previously treated as coextensive with the relevant federal constitutional provisions. E.g., *People* v. *Crittenden*, supra, 129; *State* v. *Morris*, supra, 979–80; *State* v. *Saylor*, supra, 245–46; *State* v. *Horton*, supra, 216–17; *State* v. *Jennings*, supra, 248–49; see also *State* v. *Perry*, supra, 216–17 (defendant failed to show federal analysis is flawed or there is structural difference between relevant state and federal provisions).

We have found only four states that have rejected

*Davis* on the grounds that their state constitutions provide greater protection than the federal constitution in this context. See *Steckel* v. *State*, 711 A.2d 5, 10–11 (Del. 1998); *State* v. *Hoey*, 77 Haw. 17, 36, 881 P.2d 504 (1994); *State* v. *Risk*, 598 N.W.2d 642, 648–49 (Minn. 1999); *State* v. *Charboneau*, 323 Or. 38, 58–60, 913 P.2d 308 (1996).[17] These decisions are unpersuasive, however, because they appear to be driven by judicial preference for the clarification approach rather than by a meaningful distinction between the state and federal constitutions. Indeed, none of the decisions involved any meaningful state constitutional analysis, such as we are required to perform pursuant to the *Geisler* decision.

5

The parties agree that the fifth *Geisler* factor, historical insights into the intent of the constitutional framers, is neutral because *Miranda* warnings did not exist in 1818 when our constitution was originally enacted.[18]

6

The sixth *Geisler* factor, relevant public policies, is neutral because there are policy arguments in favor of both the *Davis* bright-line approach and the clarification approach. The comparative merit of each approach was thoroughly explored in *Davis*. Compare *Davis* v. *United States*, supra, 512 U.S. 458–62 (adopting the bright-line approach) with id., 469–75 (Souter, J., concurring in the judgment) (advocating for the clarification approach). In addition, numerous academic works have addressed the impact of *Davis* as well as the merits of the bright-line and clarification approaches. E.g., M. Strauss, "*Understanding* Davis *v.* United States," 40 Loy. L.A. L. Rev. 1011, 1012–13 (2007) (analyzing comparative impact of *Davis* on women, minorities, and Caucasian men); T. Levenberg, "*Fifth Amendment— Responding to Ambiguous Requests for Counsel During Custodial Interrogations* Davis *v.* United States, 114 S. Ct. 2350 (1994)," 85 J. Crim. L. & Criminology 962, 963 (1995) (analyzing merits of bright-line, clarification, and per se approaches and proposing modified clarification approach); see also *State* v. *Effler*, 769 N.W.2d 880, 896 (Iowa) (Appel, J., specially concurring) (collecting academic and judicial writings criticizing *Davis*), cert. denied, 558 U.S. 1096, 130 S. Ct. 1024, 175 L. Ed. 2d 627 (2009). These policy perspectives need not be repeated here except to note that the policy debate among the legal and academic communities reflects the fact that "*Miranda* represents a compromise between the need of the state for effective interrogation of a suspect to solve a crime and the right of the individual to say nothing that may incriminate him." *State* v. *Stoddard*, supra, 206 Conn. 181 (*Shea, J.*, dissenting); accord *Davis* v. *United States*, supra, 460–61; *Davis* v. *United States*, supra, 469 (Souter, J., concurring in the judgment). In essence, the bright-line approach adopted by *Davis* prioritizes society's interest in effective law

enforcement whereas the clarification approach the defendant advocates prioritizes the individual's right not to say something that may incriminate him by securing the advice of counsel.

Having performed a complete *Geisler* analysis of the defendant's state constitutional claim in this appeal, we conclude that article first, § 8, does not provide greater protection than the federal constitution with respect to ambiguous or equivocal references to counsel during a custodial interrogation. Having reviewed our own constitutional language, precedents and history, we cannot discern any meaningful difference between the state and federal constitutional protections against compulsory self-incrimination that would justify or require a "third layer of prophylaxis" that the United States Supreme Court has found to be unnecessary. Moreover, the vast majority of our sister states have concluded that their state constitutions do not afford greater protections than the federal constitution in this context. Although some states have elected to adopt the clarification approach as a matter of state constitutional law, the reasoning in those decisions is not persuasive. Finally, although the defendant's position finds some support in the academic and legal communities, we do not believe that countervailing policy arguments are sufficient justification to diverge from our Supreme Court's well established precedent holding that our self-incrimination and due process clauses are coextensive with the federal self-incrimination and due process clauses. We therefore decline to adopt a new state constitutional standard at this time.

Nonetheless, we believe that it is appropriate in this opinion to reiterate the advice offered by the United States Supreme Court in *Davis*: "[W]hen a suspect makes an ambiguous or equivocal statement *it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.* . . . Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." (Emphasis added.) *Davis* v. *United States*, supra, 512 U.S. 461.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53-21 provides in relevant part: "(a) Any person who (1) wilfully . . . causes or permits any child under the age of sixteen years to be placed in such a situation that . . . the morals of such child are likely to be impaired . . . or (2) has contact with the intimate parts . . . of a child under the age of sixteen years . . . in a sexual and indecent manner likely to impair the health or morals of such child . . . ."

"Intimate parts" means, in relevant part, "the genital area . . . ." General Statutes § 53a-65 (8).

[2] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained.

See General Statutes § 54-86e.

[3] The victim's mother testified that he is in the middle of the autism scale and considered high functioning.

[4] The defendant is not circumcised.

[5] At trial, the victim's father maintained that he spoke to the victim about his sexuality because his wife found pictures of penises on the victim's Nintendo DS. In his statement to the police on September 30, 2013, however, he stated that he spoke to the victim about his sexuality because his wife found pictures of his stomach on the victim's Nintendo DS and the victim was always rubbing and touching his stomach. The victim's father did not mention in his police statement that his wife had found pictures of penises on the victim's Nintendo DS.

[6] We observe, without further comment, that the victim's mother worked for seven years as a police officer in New Haven and approximately twenty-two years in adult probation. She further acknowledged at trial that, in that capacity, she had testified "countless" times and was comfortable in a courtroom setting.

[7] The defendant further asks this court to exercise its supervisory authority over the administration of justice to implement a cease and clarify rule. "It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 764, 91 A.3d 862 (2014). "The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) Id., 765. The defendant's request implicates the scope of our supervisory authority, however, "because we normally exercise this power with regard to the conduct of judicial actors." *State* v. *Lockhart*, 298 Conn. 537, 576, 4 A.3d 1176 (2010). Although imposing a cease and clarify rule on law enforcement would directly affect the admissibility of evidence, which is surely within the authority of this court, it would also directly implicate the activities of law enforcement agencies. Accordingly, we decline to invoke our supervisory authority in the present case. Accord *State* v. *Fernandez*, 52 Conn. App. 599, 615, 728 A.2d 1 (declining defendant's invitation to exercise our supervisory authority "[b]ecause acceptance of the defendant's invitation would require this court to exercise our supervisory powers outside the conduct of judicial actors"), cert. denied, 249 Conn. 913, 733 A.2d 229, cert. denied, 528 U.S. 939, 120 S. Ct. 348, 14 L. Ed. 2d 272 (1999).

[8] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[9] Zerella testified at trial that "I actually didn't have a picture of [the defendant] . . . without any clothes on. I never did." He explained that lying to a suspect is a tactic often used by members of law enforcement to obtain information or an admission from a suspect.

[10] Although the defendant invoked his right to counsel under the Connecticut constitution, he did not argue before the trial court that the Connecticut constitution affords greater protection than the federal constitution with respect to ambiguous invocations of the right to counsel during custodial interrogations.

[11] Pursuant to Practice Book § 64-1 (a) (4), the defendant has provided this court with a signed transcript of the court's oral ruling.

[12] Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen [however] a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set [forth] in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 295–96, 25 A.3d 648 (2011).

[13] "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim

is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Internal quotation marks omitted.) *State* v. *Dixon*, 318 Conn. 495, 511, 122 A.3d 542 (2015). "The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *State* v. *Britton*, 283 Conn. 598, 615, 929 A.2d 312 (2007). "The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Dixon*, supra, 511.

[14] Article first, § 8, of the Connecticut constitution, as amended by articles seventeen and twenty-nine of the amendments, provides in relevant part: "No person shall be compelled to give evidence against himself . . . ."

The fifth amendment to the United States constitution provides in relevant part: "[No person] shall be compelled in any criminal case to be a witness against himself . . . ."

[15] Article first, § 8, of the Connecticut constitution, as amended by articles seventeen and twenty-nine of the amendments, provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[16] North Carolina has also adopted *Davis*' bright-line approach as a matter of state statutory law. See *State* v. *Saldierna*, 794 S.E.2d 474, 479 (N.C. 2016). Some states have also endorsed *Davis*' bright-line approach but not specifically evaluated whether their state constitution requires them to follow *Davis*. E.g., *Harte* v. *State*, 116 Nev. 1054, 1066–68, 13 P.3d 420 (2000) (holding the rule announced in *Davis* applies to custodial interrogations in Nevada and overruling conflicting precedent but not analyzing Nevada constitution); *Hadden* v. *State*, 42 P.3d 495, 504 (Wyo.) (finding *Davis* persuasive and adopting *Davis*' bright-line approach but not analyzing Wyoming constitution), cert. denied, 537 U.S. 868, 123 S. Ct. 272, 154 L. Ed. 2d 114 (2002). Other states have endorsed *Davis* but interpreted *Davis* to apply only to the post-*Miranda* waiver context. E.g., *State* v. *Blackburn*, 766 N.W.2d 177, 183 (S.D. 2009); *State* v. *Leyva*, 951 P.2d 738, 743 (Utah 1997) (abrogating state precedent to extent it contradicts *Davis* because *Miranda* warnings not required under state constitution). Accordingly, interrogating officers in those states must clarify an ambiguous or equivocal invocation of the right to counsel if the invocation is made before the suspect waives his *Miranda* rights.

[17] New Jersey has also adopted the clarification approach, albeit not on state constitutional grounds. The right against self-incrimination under New Jersey law "is founded on a common-law and statutory—rather than a constitutional—basis." *State* v. *Chew*, 150 N.J. 39, 50, 695 A.2d 1301 (1997). Although "New Jersey law governing the privilege against self-incrimination generally parallels federal constitutional doctrine"; id.; the New Jersey Supreme Court rejected *Davis* because it seemed "prudent" to continue to apply the clarification approach it adopted prior to *Davis*. Id., 63.

[18] Although our state constitution has been amended since 1818, the self-incrimination and due process clauses were present in the original constitution.